## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FACING FOSTER CARE IN ALASKA, 8051
Berry Patch Drive, Anchorage, AK 99502;

FAMILY EQUALITY, 475 Park Avenue South,
Suite 2100, New York, NY 10016;

TRUE COLORS UNITED, INC., 311 West 43rd
Street, New York, NY 10036; and

SERVICES & ADVOCACY FOR GLBT
ELDERS, 305 Seventh Avenue, New York, NY
10001,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201; and

NORRIS COCHRAN, in his official capacity as
Acting Secretary, United States Department of
Health and Human Services,
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201,

*Defendants*.

Civil Action No. 1:21-cv-00308

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Plaintiffs Facing Foster Care in Alaska ("FFCA"), Family Equality, True Colors

United, Inc., and Services & Advocacy for GLBT Elders ("SAGE") (collectively "Plaintiffs")

1

bring this action under the Administrative Procedure Act ("APA") to challenge the recently

issued United States Department of Health and Human Services' ("HHS") Grants Regulation, 45

C.F.R. § 75.300, 86 Fed. Reg. 2,257 (Jan. 12, 2021) ("2021 Grants Rule" or "Revised Grants

Rule"). The 2021 Grants Rule modifies a regulation finalized in 2016, which set forth clear and

uniform nondiscrimination protections for beneficiaries of and participants in services funded by

federal grants. The new Rule reverts to a confusing patchwork of protections that vary between

programs and leave many potential beneficiaries and participants, including some of the most

vulnerable members of our society, exposed to unlawful discrimination.

2.      Removing explicit basic protections from people accessing critical, often

lifesaving, government-funded services has grave consequences. HHS administers approximately

$500 billion in grants each year. HHS is the largest grant-making agency in the United States and

"the Federal government's principal agency for protecting the health of Americans and providing

essential human services, especially for those who are least able to help themselves."[1] HHS

grants fund programs that provide important health and welfare services to millions of people

around the country in a wide array of programs, including children in foster care, youth

experiencing homelessness, and older people. These beneficiaries, due to historical and current

societal inequities, are disproportionately children and people of color, sexual and gender

minorities, and from low-income families compared to the general population.

3.      In 2016, HHS prohibited, by regulation, discrimination in any of these programs

on the basis of age, disability, sex, race, color, national origin, religion, gender identity, or sexual

orientation. 45 C.F.R. § 75.300(c), 81 Fed. Reg. 89,393. It also clarified that, in accordance with

---

[1] HHS Grants Policy Statements, U.S. Dep't Health & Human Servs., at I-1 (Jan. 1, 2007),
https://www.hhs.gov/sites/default/files/grants/grants/policies-regulations/hhsgps107.pdf.

the Supreme Court's decisions holding exclusions of same-sex couples from marriage unconstitutional, all program grant recipients must treat as valid the marriages of same-sex couples. *Id.* § 75.300(d) (collectively, the "Prior Rule" or "2016 Grants Rule").

4.      Now, barely four years later, HHS has promulgated a new rule that would gut the protections of the 2016 Grants Rule. The 2021 Grants Rule eliminates the nondiscrimination protections except to the extent they are already required by federal statute. The 2021 Grants Rule also abandons the important clarification that grant "recipients must treat as valid the marriages of same-sex couples" in accordance with *United States v. Windsor*, barring discrimination by the federal government against same-sex couples under the Fifth Amendment, and *Obergefell v. Hodges*, holding unconstitutional laws barring same-sex couples from marriage under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, 81 Fed. Reg. at 89,395. The 2021 Grants Rule states instead only that HHS will "follow all applicable Supreme Court decisions" in administering grant programs, Health & Human Servs. Grants Reg., 86 Fed. Reg. 2,257 at 2,278 (Jan. 12, 2021). The 2021 Grants Rule invites discrimination against beneficiaries and participants, particularly on the basis of sex, including sexual orientation and gender identity, and religion. Further, these changes create massive confusion about which programs incorporate which protections and what state and local laws prohibit discrimination. They also require providers to determine how to apply various Supreme Court decisions to ensure the rights of beneficiaries under federal law are protected.

5.      The 2021 Grants Rule largely ignores that protections under the U.S. Constitution may apply, although the particular constitutional protections implicated in any given

circumstance are not necessarily as clear as the universal nondiscrimination protections provided in the 2016 Grants Rule.[2]

6.      Those beneficiaries[3] of HHS grant-funded programs or services who are most likely to be adversely impacted are among the most vulnerable members of our communities. This includes lesbian, gay, bisexual, transgender, or queer ("LGBTQ") youth in foster care or experiencing homelessness. LGBTQ families, including prospective foster and adoptive parents, interacting with the child welfare system are also likely to be subjected to an increase in discrimination as a result of the 2021 Grants Rule. Similarly, vulnerable LGBTQ older people who depend on critical aging services to obtain nutrition, ease social isolation, and receive holistic care are put at risk by the elimination of express federal protections attached to the funding streams for these services. These impacts on youth, parents, and seniors are even worse in states, counties, and cities without local nondiscrimination protections.

7.      The Revised Grants Rule will also exacerbate discrimination on the basis of religion. A significant number of the statutes authorizing critical HHS-funded programs—including Title IV-E of the Social Security Act (which provides funding for foster care and adoption assistance), the Older Americans Act (which provides funding for a wide range of social services for older people), and the Improving Head Start for School Readiness Act (which authorizes the national Head Start program and provides comprehensive developmental services to economically disadvantaged preschool children and their families)—do not contain independent prohibitions on religious discrimination. Though there is a preexisting regulation

---

[2] References to "federal law" herein do not encompass such protections under the U.S. Constitution.
[3] The Grants Rule applies to both beneficiaries of and participants in HHS programs and services. *See* 45 C.F.R. § 75.300(c). For the sake of brevity, references herein to "beneficiaries" also include "participants".

4

that bars grantees from discriminating against HHS beneficiaries or prospective beneficiaries on the basis of religion, *see* 45 C.F.R. § 87.3(d), this provision is not as broad as the nondiscrimination protections included in the 2016 Grants Rule, and the 2021 Grant Rule's reversion to "statutory" nondiscrimination protections creates confusion about the effectiveness of § 87.3(d)'s regulatory protections.

8.      The 2021 Grants Rule violates the APA's prohibition against arbitrary and capricious agency actions. Its proffered justifications are unreasoned, undeveloped, incorrect, and conflict with many of HHS's own program-specific regulations, findings, policies, and priorities. The Rule does not provide an adequate rationale for HHS's sudden reversal in position from the regulation promulgated four years ago. It fails to consider, much less adequately grapple with, important aspects of the problem. For instance, HHS fails to consider the obvious and serious consequences of its policy change, including the damaging effects, both stigmatic and practical, of increased discrimination in the provision of federally funded services, and increased confusion as to the scope of nondiscrimination protections in HHS funded programs and services. The 2021 Grants Rule also ignores the reliance interests of grant recipients and beneficiaries who have depended upon the Prior Rule in multiple ways.

9.      Plaintiffs respectfully request that the Court declare that the 2021 Grants Rule violates the APA and set it aside. Plaintiffs further request that the Court stay the effective date of the 2021 Grants Rule pending this litigation.

## PARTIES

10.      Plaintiff Facing Foster Care in Alaska ("FFCA") is a nonprofit, nonpartisan membership organization composed of current and former foster youth. FFCA is dedicated to improving the foster care system, developing leadership and self-advocacy skills among its

members, and creating a network of peer support that is a lifeline for many foster youth and alumni. FFCA's members include more than 300 current and former foster youth in Alaska, including Alaska Native youth (who represent approximately 60 percent of youth in foster care in Alaska despite making up only 16 percent of the general population), LGBTQ youth, and Alaska Native LGBTQ youth. To represent the views of its members, FFCA is led by a Statewide Youth Leadership Board composed of nine elected FFCA members aged 15 to 24. The Youth Leadership Board, composed of and elected by members, sets the direction of the organization as a whole, which is in turn carried out by FFCA's members, staff, and Board of Directors.

11.     To advance its mission, FFCA staff and members conduct various activities. First, FFCA regularly advocates at the state level for legislation, regulations, policies, and practices that will improve the safety, permanency, and well-being of youth in the foster care system, including LGBTQ youth. Second, FFCA provides direct services and support to current and former foster youth through (i) education (ii) peer support, and (iii) individual assistance navigating the foster care system and the transition to adulthood. Third, FFCA provides community education and training to ensure that individuals involved in the child welfare system—such as child welfare staff, judges, child advocates, tribal advocates, service providers, educators, and foster parents—have the tools to support foster youth throughout their experience in the foster care system.

12.     Plaintiff Family Equality (previously known as "Family Equality Council") is a nonprofit, nonpartisan organization that is headquartered in New York, NY. Founded in 1979, Family Equality's mission is to advance legal and lived equality for LGBTQ families. Recognizing that every LGBTQ person has a right to form and sustain a loving family, and that

all children deserve a stable, loving forever family, Family Equality advances its mission in part by working to ensure that adoption and foster care services, including those funded by HHS grant programs, are free from discrimination.

13.     To further this mission, Family Equality's daily operations include several activities that are relevant here. First, Family Equality conducts outreach and education to LGBTQ families and support groups to ensure that those families understand their rights and are empowered to advocate for themselves. Second, Family Equality works on the federal and state levels to ensure that adoption and foster care services do not discriminate against LGBTQ youth in need of homes or LGBTQ parents, including LGBTQ adults seeking to become foster parents, adoptive parents, or legal guardians. This work involves securing affirmative protections at the federal and state level and working to stop or repeal policies that allow for discrimination, such as license-to-discriminate laws that allow government-funded providers to discriminate in the name of religion. To that end, Family Equality convenes and co-chairs the Every Child Deserves a Family Campaign, a national campaign of over 500 faith, child welfare, civil rights, LGBTQ, and allied organizations and individuals. Campaign members come together in an effort to end anti-LGBTQ discrimination in the child welfare system and promote the best interests of all children in the child welfare system by increasing their access to loving, stable forever homes, if they cannot safely return to their parent or parents. The State Coalition works to support and foster state-level efforts to ensure state child welfare systems are inclusive and that they affirm and support LGBTQ youth in care as well as LGBTQ families of origin, kin, and foster and adoptive parents. This includes supporting state-level efforts to combat discriminatory adoption and foster care bills and harmful policies and practices, to advance inclusion of the LGBTQ community, and to affirm communities of faith in systemic reform to expand nondiscrimination

protections and affirming practices. The National Coalition carries out similar work on the federal level.

14.     Plaintiff True Colors United is a nonprofit, nonpartisan organization that is headquartered in New York, NY. Founded in 2008, True Colors United is an advocacy and direct services organization. Its mission is to implement innovative solutions to youth homelessness that focus on the unique experiences of LGBTQ young people. Recognizing that LGBTQ youth are 120 percent more likely to experience homelessness than their non-LGBTQ peers, True Colors United furthers its mission by working to end youth homelessness and to ensure that homelessness services, many of which are funded through HHS grant programs, are safe for LGBTQ youth.

15.     In its daily operations, True Colors United accomplishes these objectives through several activities. First, True Colors United offers free training, education, and technical assistance programs to homelessness service providers to ensure that LGBTQ youth experiencing homelessness have access to safe and supportive services, and to increase the likelihood that youth homelessness is rare and brief. Second, True Colors United works at the federal, state, and local levels to promote funding, policies, systems, and protections that meet the needs of LGBTQ youth experiencing homelessness, including protections from discrimination, as well as affirmation and support related to all aspects of a youth's identities, including race, religion, sex, sexual orientation, gender identity, and gender expression. Third, True Colors United provides LGBTQ youth experiencing homelessness with leadership development opportunities that elevate their voices so they can play an active role in creating solutions to homelessness and other related problems.

16.    Plaintiff SAGE is a nonprofit, nonpartisan organization that is headquartered in New York, NY. Founded in 1978, SAGE is a national services and advocacy organization whose mission is to allow LGBTQ older people to age with respect and dignity.

17.    SAGE does its work on behalf of LGBTQ older adults through a variety of programs. First, SAGE provides direct services to LGBTQ older people in New York City through its "SAGE Centers," where LGBTQ older people may obtain meals, access social and cultural programming, and gain assistance with obtaining a variety of aging services (*e.g*., health, financial, and social services; short-term counseling and support groups; care management; financial aid; and benefits and entitlements assistance). Similarly, SAGE coordinates a network of affiliates that provide various services nationwide, ranging from the organization of social gatherings to the provision of congregate meals (*i.e.*, meals served at group sites such as senior centers). SAGE has also established a housing initiative under which it has partnered with other organizations to support the construction of LGBTQ-friendly elder housing across the country and to build the first LGBTQ-friendly elder housing in New York. Further, SAGE works at the federal- and state-levels to ensure that policies, systems, and protections are in place to meet the needs of LGBTQ older people. Finally, SAGE runs the National Resource Center on LGBT Aging and provides cultural competency training through its SAGECare program.

18.    Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C., at 200 Independence Avenue, S.W., Washington, D.C. 20201. HHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

19.     Defendant Norris Cochran is sued in his official capacity as the Acting U.S. Secretary of Health and Human Services. His official address is 200 Independence Avenue, S.W., Washington, D.C. 20201.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

22.     This Court has authority to grant the requested relief in this case pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

## LEGAL BACKGROUND

23.     The APA allows a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. § 702. Under the APA, a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

24.     On review, an agency's action must be upheld, if at all, on the basis articulated by the agency itself. The APA requires an agency to provide a reasoned explanation for its action, including a rational connection between the facts found and the choices made. An agency action shall be set aside as arbitrary and capricious if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTUAL ALLEGATIONS

### A. The 2016 Grants Rule Clarified the Scope of HHS Nondiscrimination Policies.

25.     Discrimination on the basis of race, color, national origin, disability, and age in federal grants programs generally is prohibited by broadly applicable statutes. *See* 42 U.S.C. § 2000d, 29 U.S.C. § 794, 42 U.S.C. § 6102. But similarly broad and universal statutory nondiscrimination requirements do not exist for religion and sex (including sexual orientation and gender identity), leaving beneficiaries subject to inconsistent and inadequate protections under federal law.

26.     The various federal statutes establishing HHS's many grant programs address program-specific nondiscrimination requirements in very different ways or not at all.[4] As such, historically, a beneficiary's right to be free from discrimination under federal law varied depending on the nuances of the particular grant program at issue.

27.     For example, in the grant programs especially relevant to the Plaintiffs in this lawsuit, the statutory protections vary widely. Title IV-E of the Social Security Act, which provides funding for foster care and adoption assistance, prohibits discrimination as to the child, parents, or prospective foster or adoptive parents on the basis of race, color, or national origin, but not religion or sex (including sexual orientation and gender identity). 42 U.S.C. § 671(a)(18). The Older Americans Act, which authorizes funding for various services to older people, 42

---

[4] HHS also has certain regulatory protections against discrimination, although they typically do not apply as broadly as do the federal statutory protections, and the 2021 Grants Rule creates confusion about the ongoing validity of those requirements. *See* 45 C.F.R. § 87.3(d) (prohibiting discrimination against program beneficiaries or prospective program beneficiaries in covered HHS social service programs on the basis of religion).

U.S.C. § 3001 *et seq.*, does not include its own nondiscrimination requirements, again leaving beneficiaries without explicit protection from discrimination. The Runaway and Homeless Youth Act, which authorizes funding for youth emergency shelters and transitional living programs, 34 U.S.C. § 11201 *et seq.*, does not include its own nondiscrimination provisions, but for that program, HHS regulations do contain broad protections. 45 C.F.R. § 1351.22(a) ("No runaway youth or homeless youth shall . . . be excluded from participation in, be denied the benefits of, or be subject to discrimination under, any program or activity funded in whole or in part under the Runaway and Homeless Youth Act" on the basis of "race, ethnicity, nationality, age, religion/spirituality, gender identity/expression, sexual orientation, socioeconomic status, physical or cognitive ability, language, beliefs, values, behavior patterns, or customs."). The emphasis on statutory protections in the 2021 Grants Rule will cause confusion about the validity of this remaining regulatory protection.

28.    As HHS determined in 2016, the inconsistent statutory schemes establishing its many grant programs did not reflect HHS's existing broad and universal nondiscrimination policies or Due Process and Equal Protection guarantees in the Supreme Court's marriage-equality decisions, *United States v. Windsor* and *Obergefell v. Hodges*.

29.    Accordingly, HHS's Prior Grants Rule provides for clear and uniform nondiscrimination protections. Health and Human Services Grants Regulation, 81 Fed. Reg. 89,393 (Dec. 12, 2016), codified at 45 C.F.R. Part 75. The 2016 Grants Rule clarified the scope of HHS nondiscrimination policies, prohibiting discrimination in all grant programs "based on non-merit factors such as age, disability, sex, race, color, national origin, religion, sexual orientation, or gender identity." *Id.*

30.     As the agency explained in its proposed rulemaking, the 2016 Grants Rule reflected existing law, including the Supreme Court's marriage-equality decisions, and HHS policy that had not previously been codified in regulation. Health and Human Services Grants Regulation, 81 Fed. Reg. 45,271, 45,272 (July 13, 2016). It also made clear that the nondiscrimination requirements imposed on grantees were consistent with those HHS already required of its contractors. *Id.*; *see also* 48 C.F.R. § 352.237-74.

31.     HHS characterized the Rule as "non-controversial" because the nondiscrimination changes were "proposed for consistency with law and current HHS policy," but "nonetheless request[ed] public comment." *Id.*

32.     In response to the non-discrimination provisions, HHS received "twelve comments . . . , all of which were strongly supportive of the codification of the nondiscrimination provisions in HHS awards." 81 Fed. Reg. at 89,393.

33.     Accordingly, since January 2017, 45 C.F.R. § 75.300 required:

(c) It is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation. Recipients must comply with this public policy requirement in the administration of programs supported by HHS awards.

(d) In accordance with the Supreme Court decisions in *United States v. Windsor* and in *Obergefell v. Hodges*, all recipients must treat as valid the marriages of same-sex couples. This does not apply to registered domestic partnerships, civil unions or similar formal relationships recognized under state law as something other than a marriage.

45 C.F.R. § 75.300.[5]

---

[5] One exception is that "Section 75.300(c) does not apply to the Temporary Assistance for Needy Families Program (title IV-A of the Social Security Act, 42 U.S.C. 601-619)." 45 C.F.R. §75.101(f).

34.     In addition to child welfare programs and services for youth experiencing
homelessness and older people, the 2016 Grants Rule impacted a wide range of other grant
programs. Those programs include, but are not limited to, major health initiatives (such as grants
for HIV/AIDS prevention and support programs), early childhood programs (such as Head Start),
nutrition assistance programs (such as HHS-funded congregate meals), residential shelter
services for unaccompanied immigrant minors, refugee assistance services, family caregiver
support programs, domestic violence prevention and response programs, and efforts to combat
human trafficking.[6] Nondiscrimination protections in these and other HHS-funded programs are
not nearly as strong absent the 2016 Grants Rule. For instance, statutes authorizing the
Community Economic Development Program and the Head Start program, do not protect against
religious discrimination, *see* 42 U.S.C. §§ 9821, 9918, 9949; and while HHS has a preexisting
regulation barring religious discrimination against program beneficiaries or prospective program
beneficiaries, it would not prevent discrimination based on the religious identity of an individual
in the household who is not considered a beneficiary, *see* 45 C.F.R. § 87.3(d). As another
example, statutes authorizing the Office in Domestic Victims of Human Trafficking Services and
Outreach Program do not protect against discrimination on the bases of sexual orientation,
gender identity, or religion. 22 U.S.C. § 7101-7114. HHS's own reports acknowledge that
LGBTQ youth are at risk of victimization by traffickers when they run away from foster homes
due to rejection related to their sexual orientation or gender identity, but an LGBTQ youth
survivor of trafficking seeking services from, for example, a faith-based HHS grantee is not
explicitly shielded from discrimination under federal law absent the protections of the 2016
Grants Rule.

---

[6] *See* 45 C.F.R. § 75.101 (identifying scope of grant programs governed by the UAR).

**B.   HHS's Revised Grants Rule Abandons Clear and Universal Nondiscrimination Protections Under Federal Law.**

35.     On November 1, 2019, HHS announced a pair of agency actions that would eliminate the 2016 Rule's broad and universal nondiscrimination requirements.[7]

36.     First, HHS issued a Notice of Nonenforcement stating that HHS would no longer enforce the 2016 Grants Rule pending the agency's decision on a contemporaneously proposed rulemaking. Notice of Nonenforcement of Health and Human Services Grants Regulation, 84 Fed. Reg. 63,809-01 (Nov. 19, 2019) ("Notice of Nonenforcement"). The Notice of Nonenforcement was an unlawful final rule, issued without notice and an opportunity to comment and resulting from arbitrary and capricious reasoning in violation of the APA. For these reasons, the Notice of Nonenforcement is subject to an ongoing legal challenge. *See Family Equality et al. v. Azar et al.*, No. 20-cv-02403 (MKV), Corrected Complaint, ECF No. 22 (S.D.N.Y. Apr. 1, 2020). For the nearly fifteen months in which it has been in place, it has invited discrimination against vulnerable beneficiaries of HHS-funded programs and reduced the efficacy of the nondiscrimination protections.

37.     Along with its Notice of Nonenforcement, HHS proposed a Revised Grants Rule. This proposed rule, in its now final form, but not yet effective, is the subject of the instant lawsuit.

38.     The now-final 2021 Grants Rule codifies HHS's abandonment of its broad and universal regulatory nondiscrimination prohibitions, inviting and sanctioning discrimination in various grant programs on the basis of religion, sex, sexual orientation, and gender identity,

---

[7] *See* Press Release, *HHS Issues Proposed Rule to Align Grants Regulation with New Legislation, Nondiscrimination Laws, and Supreme Court Decisions*, U.S. Dep't Health & Human Servs. (Nov. 1, 2019), https://www.hhs.gov/about/news/2019/11/01/hhs-issues-proposed-rule-to-align-grants-regulation.html.

among other non-merit factors, and causing uncertainty and confusion among grant recipients and program participants.

39.     In proposing this rule, HHS explained that it would require grantees to comply only with the statutory discrimination protections set forth in its various grant programs. *See* Health and Human Services Grants Regulation, 84 Fed. Reg. 63,831, 63,832 (Nov. 19, 2019) ("2019 Proposed Rule").

40.     Accordingly, the Revised Grants Rule replaces the prior subparagraphs in 45 C.F.R. 75.300(c) and (d) with the following language:

> (c) It is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services, to the extent doing so is prohibited by federal statute.

> (d) HHS will follow all applicable Supreme Court decisions in administering its award programs.

86 Fed. Reg. at 2,278.[8]

41.     Absent any stays, the Revised Grants Rule will go into effect on February 11, 2021. 86 Fed. Reg. at 2,257. President Biden's Chief of Staff, however, issued a memorandum to all agency heads on January 21, 2021, instructing them to consider, for rules that have been published in the Federal Register but have not taken effect, postponing the rules' effective dates for 60 days from the date of the memorandum, consistent with appliable law and certain specified exceptions, "for the purpose of reviewing any questions of fact, law, and policy the

---

[8] The Revised Grants Rule also eliminates a provision related to the 2016 Grants Rule at 45 C.F.R. § 75.101(f) (clarifying that the 2016 Grants Rule does not apply to the Temporary Assistance for Needy Families Program). It also makes unrelated technical changes, which Plaintiffs do not challenge. 86 Fed. Reg. at 2,257.

rules may raise."[9]  If HHS issues a stay pursuant to this memorandum, the effective date of the

2021 Grants Rule will be March 21, 2021, but HHS has yet to take such action.

**C. HHS's Purported Justifications for the Rule Change Do Not Reflect Reasoned Analysis.**

42.      HHS justified the rule change on six grounds, none of which is well-reasoned or

well-founded. These justifications turn largely on speculative, unwarranted, and overstated

"concerns" about the prior state of play—(i) "concerns" about disturbing the Congressionally

established balance of nondiscrimination protections, (ii) "concerns" about potential faith-based

challenges to the 2016 Grants Rule, (iii) "concerns" about overstepping HHS's mandate by

requiring non-state actors to comply with the Supreme Court's decisions in *Windsor* and

*Obergefell*, (iv) "concerns" about HHS's regulatory authority to promulgate the 2016 Grants

Rule, (v) "concerns" about the potential effect of the 2016 Grants Rule on regulatory clarity and

program effectiveness, and (vi) "concerns" about HHS's decision to impose nondiscrimination

protections where it is "under no legal obligation" to do so.

43.      Despite a dearth of evidence undergirding these concerns and a wide range of

reasons presented by commenters to discount them, HHS ignored, dismissed, or misstated

comments and facts in support of the prior Rule, many of which cited HHS's own policies and

studies demonstrating discrimination beneficiaries face as well as the public policy need to

protect them. Ultimately, HHS justified the rule change by insisting that it was not required to

impose the nondiscrimination requirements in the 2016 Grants Rule and stating that it no longer

---

[9] Memorandum from Ronald A. Klain, Assistant to the President and Chief of Staff, to the Heads of Exec. Dep'ts & Agencies, Regulatory Freeze Pending Review (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/regulatory-freeze-pending-review/.

wishes to do so. This is not a reasoned basis to change tack. The rule change is therefore arbitrary and capricious and must be deemed unlawful and set aside.

### a. Congressionally Established Balance of Nondiscrimination Protections

44.     HHS justified the rule change by claiming that the 2016 Grants Rule disturbed "the Congressionally established balance with respect to nondiscrimination requirements" by making "a number of nondiscrimination requirements, including certain nonstatutory nondiscrimination requirements, applicable to all grantees in all Departmental grant programs, regardless of whether Congress had made such requirements applicable to the grantees in particular Departmental programs." *Id.* at 2,271.

45.     This assertion is inconsistent with HHS's prior practice, and HHS does not acknowledge or explain the basis for its departure. For example, the authorizing legislation for the Runaway and Homeless Youth Program includes no nondiscrimination protections, 34 U.S.C. § 11201, *et seq.*, but HHS previously added comprehensive and detailed nondiscrimination requirements by regulation, 45 C.F.R. § 1351.22(a), and did so based on its general rulemaking authority for the program, not a congressional mandate. *See* HHS Runaway and Homeless Youth Rule, 81 Fed. Reg. 93,030, 93,030 (Dec. 20, 2016) (citing as authority prior 42 U.S.C. § 5702, which authorized the Secretary of HHS to "issue such rules as the Secretary considers necessary or appropriate to carry out the purposes of this subchapter").

46.     Even more recently, in a December 2020 rulemaking, HHS reaffirmed certain religious nondiscrimination provisions found in Part 87 that were not mandated by statute. Equal Participation of Faith-Based Organizations in the Federal Agencies' Programs and Activities, 85 Fed. Reg. 82,037, 82,043 (Dec. 17, 2020) (retaining protections found at 45 C.F.R. § 87.3(d), despite eliminating others). HHS offered no principled basis for concluding that the 2016 Grants

Rule improperly disturbed "the Congressionally established balance" while the December 2020 rule did not.

47.     Moreover, as HHS recognized, it has already determined that it is appropriate to extend nondiscrimination provisions beyond the statutory minimum for HHS service contractors. *See* Health and Human Services Acquisition Regulations, 80 Fed. Reg. 72,150, 72,182 (Nov. 18, 2015). Indeed, aligning the rules governing HHS grants with the rules governing HHS service contracts was part of HHS's justification for promulgating the 2016 Grants Rule in the first place. *See* 81 Fed. Reg. at 45,271. Yet in issuing the 2021 Grants Rule, HHS dismissed its prior efforts to harmonize these regulations as misguided. In particular, HHS hypothesized that "the Department may have greater latitude to impose nondiscrimination and other requirements on a contractor than on a grantee" because the purpose of a procurement contract "is to acquire goods or services for the direct benefit or use of the government," whereas the purpose of a grant "is to transfer something of value to the recipient 'to carry out a public purpose of support or stimulation authorized by a law of the United States.'" 86 Fed. Reg. at 2,264. Beyond identifying the differences between a grant and a procurement contract, HHS in no way explained why its authority to regulate grantees' treatment of the public using HHS funds acquired through a grant could somehow be lesser than its authority to regulate contractors' treatment of the public using HHS funds acquired through a service contract. Nor did it consider any contrary arguments before reaching this conclusory determination.

48.     Furthermore, HHS did not mention its supposed concern about Congressional balancing of nondiscrimination protections in the Notice of Proposed Rulemaking. *See* 84 Fed. Reg. at 63,831-36. This omission deprived commenters of the opportunity to respond to this justification, and also suggests that the justification is pretextual.

### b. Religious Freedom Restoration Act

49.      According to HHS, the revisions are necessary to avoid "issues" under the

Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq. *Id.* at 63,833. In

particular, HHS asserted that "[t]he imposition of certain nonstatutory nondiscrimination

requirements on certain faith-based organizations as recipients or subrecipients in the

Department's programs would *likely* constitute a substantial burden on their exercise of religion

that is not the least restrictive means of furthering a compelling government interest and, *likely*,

constitute a violation of RFRA." 86 Fed. Reg. at 2,271-72 (emphasis added).

50.      HHS's RFRA analysis is flawed, speculative, unsupported, and overbroad.

Notably, in reaching this determination, HHS pointed to no situation in which the 2016 Grants

Rule was found to actually violate RFRA. Instead, HHS relied on: (i) a Michigan district court

decision to preliminarily enjoin HHS from enforcing § 75.300(c) with respect to a faith-based

charity's refusal to certify same-sex couples as suitable adoption parents; (ii) the purported

existence of "several requests for exceptions from § 75.300(c) and (d)"; and (iii) HHS's own

determination, in light of the only two requests for exceptions that it actually identified in the

2021 Grants Rule, that RFRA prohibits it from enforcing § 75.300(c) with respect to faith-based,

child-welfare service providers participating in foster care and adoption programs in South

Carolina and Texas. *Id.* at 2,259-60. Citing these three experiences, HHS claimed that the rule

change is the "best way" to avoid RFRA concerns. *Id.* at 2,266. However, HHS failed to even

complete its RFRA analysis, including by evaluating whether the government interest in the

efficacy of its grant programs is "compelling" pursuant to 42 USC § 2000bb-1(b)(1).

51.      HHS cannot plausibly base a far-reaching reversal of HHS's policy and regulatory

agenda on such a flimsy foundation. The Michigan court's issuance of a preliminary injunction is

not a ruling on the merits of plaintiffs' RFRA claim and, in any event, reflects a single district court's assessment of a single application of § 75.300 to a single provider in one state. HHS's analysis also failed to account for the merits of two open lawsuits challenging, on constitutional grounds, HHS's decision to grant an exception from enforcement of § 75.300(c) to South Carolina, permitting faith-based, HHS-funded agencies to use religious criteria when determining the suitability of foster parents. *See Rogers v. U.S. Dep't of Health & Human Servs.*, No. 19-cv-01567-JD (D.S.C. 2019); *Madonna v. U.S. Dep't of Health & Human Servs.*, No. 19-cv-03551-JD (D.S.C. 2019). HHS's RFRA justification thus turns on an overstatement of the RFRA challenges prompted by the 2016 Grants Rule, a refusal to grapple with the legal validity of those RFRA concerns, and a failure to contemplate the legal risk of extending RFRA beyond its intended reach.

52.    HHS also fails to take seriously the obvious alternative response to its supposed RFRA concerns: continuing to evaluate on a case-by-case basis individual requests for exemption from the Rule's nondiscrimination requirements by faith-based organizations.[10] HHS admits that a narrower approach "would address the RFRA issues," but falls back on its stated concern for "the balance struck by Congress on nondiscrimination provisions" and cryptically concludes that such exemptions "would raise competing concerns that might require careful balancing." 86 Fed. Reg. at 2,272. Speculation about unfounded RFRA concerns, which, if they materialized, could be dealt with more narrowly, cannot support the policy change.

---

[10] To be properly granted, any such requests by faith-based organizations for exemptions from the Rule's nondiscrimination requirements would have to satisfy the necessary criteria under RFRA. Contrary to HHS's own conclusion in the Rule, and as evidenced by the two pending legal challenges noted above, which raise Establishment Clause and Equal Protection claims, the waiver from § 75.300(c) granted to South Carolina did not meet those criteria.

### c.   Compliance with Applicable Supreme Court Decisions

53.     Next, HHS insisted that the 2021 Grants Rule "appropriately focus[ed] on compliance with applicable Supreme Court decisions," and accordingly eliminated the specific reference to the marriage-equality decisions. *Id*. at 2,272. This reasoning departs from the 2016 Grants Rule's explanation that specific reference to *Windsor* and *Obergefell* was intended to "ensure[] that same-sex spouses, marriages, and households are treated the same as opposite-sex spouses, marriages, and households" when determining eligibility for or participating in HHS grant programs. 81 Fed. Reg. 45,720, 45,721 (July 13, 2016).

54.     To justify the departure, HHS claimed that extending *Windsor* and *Obergefell* to non-state actors "*could* raise concerns under the unconstitutional conditions doctrine," "depending on how broadly that provision were interpreted." 86 Fed. Reg. at 2,263. This is a grossly over-simplified and poorly reasoned justification for reversing course, especially because HHS did not actually determine that the provision was unconstitutional and because HHS could readily incorporate the 2016 Grants Rule into various specific grant agreements in a manner that does not impose unconstitutional conditions should it have a concern in particular contexts. Justifying the complete withdrawal of explicit protections because some interpretations or applications allegedly "could raise" concerns fails to consider obvious alternatives and is thus unreasoned. Moreover, HHS failed to acknowledge Supreme Court authority directing courts to interpret regulations in such a way as to avoid raising constitutional concerns where, as is true here, such an interpretation is possible. *See, e.g.*, *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 506-07 (1979).

### d.  Regulatory Authority

55.     HHS claims that it is uncertain about whether it had authority to promulgate the

2016 Grants Rule. 86 Fed. Reg. at 2,263. Despite referencing its purported lack of authority

throughout the preamble, HHS explicitly declined to rely on any supposed lack of authority as a

justification for the Rule. 86 Fed. Reg. at 2,257 n.1 (HHS declined to "resolve the issue

definitively because the Department believes that amending these provisions is warranted in light

of the other reasons set forth in this preamble."). Such an incomplete justification does not

support HHS's decision. HHS's generalized concerns that its authority "is not clear" and noting

legal challenges to the use of the Housekeeping Statute to implement "substantive statutory

requirements" are too speculative to support its decision. HHS failed to assess *any* potential

arguments in favor of its power to promulgate the 2016 Grants Rule. And HHS failed to evaluate

whether or how pending suits challenging its use of the Housekeeping Statute in other

circumstances, such as challenges to a recent rule expanding health providers' ability to refuse

care on religious or moral grounds, are distinguishable on this or other grounds. HHS also did

not consider the reasonable alternative of reviewing the statutes authorizing its various grant

programs and assessing whether these statutes give HHS general rulemaking authority sufficient

to assuage any concerns about its authority to issue the 2016 Grants Rule, and repromulgating

the Rule identifying those various additional bases for authority.

56.     Furthermore, in questioning its own rulemaking authority, HHS failed to

acknowledge or explain the departure from its previous analysis and long-standing positions. For

instance, in 2004, HHS promulgated 45 C.F.R. Part 87, which included nondiscrimination

provisions barring organizations that participate in HHS-funded programs from discriminating

on the basis of religion against program beneficiaries or prospective program beneficiaries. 69

Fed. Reg. 42,586, 42,593 (July 16, 2004). Like the 2016 Grants Rule, part 87 of the Code of

Federal Regulations was also promulgated pursuant to the Housekeeping Statute. *See id.* HHS

did not explain why, if it had authority to promulgate nondiscrimination provisions pursuant to

the Housekeeping Statute in 2004, it somehow lacked that authority in 2016.

57.     Notably, the Notice of Proposed Rulemaking observed only that "[s]ome non-

Federal entities ha[d] expressed concerns" that the 2016 Grants Rule exceeded HHS's statutory

authority, 84 Fed. Reg. at 63,832, and HHS in no way indicated that it shared these concerns.

For HHS to now cite amorphous concerns about its rulemaking authority as a central justification

for the 2021 Grants Rule, while simultaneously stating it "does not need to resolve these issues

definitely," 86 Fed. Reg. at 2,257 n.1, indicates that the rationale is unreasoned and pretextual.

### e.   Uncertainty and Program Effectiveness

58.     Perhaps most egregiously, HHS justified the rule change with an entirely one-

sided assessment of its potential effect on regulatory clarity and program effectiveness.

Concluding, without justification or evidence, that program effectiveness hinges solely on the

numbers of providers available versus the ability of beneficiaries to access all programs safely

and without barriers to their participation, HHS claimed that the 2016 Grants Rule "sowed

uncertainty for grant applicants, recipients, and subrecipients that could deter participation in

Department-funded programs and, over time, undermine the effectiveness of those programs." 86

Fed. Reg. at 2,263. HHS never specified precisely what "uncertainty" the 2016 Grants Rule

"sowed"—nor is such uncertainty self-evident, given that the 2016 Grants Rule applied the same

nondiscrimination requirements universally. HHS also failed to adequately consider the

significant uncertainties generated by the Revised 2021 Grants Rule.

59.     Following promulgation of the 2021 Grants Rule, it is entirely unclear what nondiscrimination requirements apply to which grantees. The Revised Grants Rule refers only to applicable nondiscrimination protections in "federal statute" and therefore creates significant confusion as to whether grantees must still comply with the nondiscrimination protections in other, preexisting regulations. For instance, as noted above, 45 C.F.R. § 87.3(d) generally prohibits HHS-funded organizations from discriminating against program beneficiaries or prospective program beneficiaries on the basis of religion, and 45 C.F.R. § 1351.22(a), bars grant recipients in the Runaway and Homeless Youth Street Outreach, Basic Center, and Transitional Living (RHY) programs[11] from discriminating on a wide range of traits, including gender identity/expression and sexual orientation. The interplay between these and other preexisting rules and the HHS grantees' new, seemingly narrower obligations under the 2021 Grants Rule is unclear.

60.     HHS claimed that the 2021 Grants Rule introduces no ambiguities in grantees' nondiscrimination obligations because the 2021 Rule's reference to "federal statute" also "encompasses binding case law authoritatively interpreting the statute, as well as any regulations duly promulgated pursuant to statutory rulemaking authority that address discrimination in particular programs." 86 Fed. Reg. at 2,262 n.15. This "clarification" further muddies the waters, as determining what is required under "authoritative" case law may well be more difficult than the clear standard that was provided by the 2016 Grants Rule, and it also does not consider other sources of protections such as the Constitution. And other statements in the Revised Grants

---

[11] Under those programs, grant recipients provide youth experiencing homelessness with emergency shelter, crisis intervention, food, clothing, and medical care, as well as longer-term interventions to support them in achieving better outcomes in employment, housing, health, and education. As noted above, the authorizing statute for this program does not include its own nondiscrimination protections.

Rule—including HHS's repeated insistence that grantees are "*free*, consistent with their other legal and regulatory obligations, to observe nonstatutory nondiscrimination practices," *id.* at 2,268 (emphasis added); *see also id.* at 2,270— are no comfort to vulnerable program beneficiaries such as LGBTQ youth who rely on legal protections against discrimination. Such statements also undercut any suggestion that HHS views these preexisting regulatory nondiscrimination provisions as binding on HHS grantees.

61.      HHS further insisted that no confusion would arise following implementation of the Revised Grants Rule because grantees "are likely familiar with the varying eligibility requirements imposed by Congress for various grant requests," and HHS agencies are required under 45 C.F.R. § 75.300(a) to inform recipients of the relevant public policy requirements, including applicable nondiscrimination requirements. 86 Fed. Reg. at 2,270. HHS's theory that grantees already understand their nondiscrimination obligations is pure conjecture and ignores the ways that HHS's action over the past four years have created confusion over the scope of nondiscrimination requirements. Moreover, HHS's communication requirements under § 75.300(a) are relevant only insofar as they are being followed, which is itself uncertain. For example, in 2019, HHS abandoned its efforts via training and technical assistance to ensure that RHY grantees understand and comply with the program-specific non-discrimination requirements and to ensure that homeless youth understand they are protected against discrimination. *See infra* ¶ 113. Section 75.300(a) therefore serves no stop-gap role in stemming discrimination by RHY grantees, and it may be similarly meaningless for other HHS programs, as well. HHS also fails to consider that grantees often provide a range of services funded by an array of overlapping grant programs, making it difficult to keep track of, much less successfully educate staff on, which unique nondiscrimination protections apply to which of their various

services. And HHS's theory as to Section 75.300(a)'s communication requirements does nothing to ensure that beneficiaries are aware of their nondiscrimination protections.

62.    Because of the increased confusion generated by the 2021 Grants Rule, HHS's determination that amending the rule will "make compliance more predictable and simple for grant recipients, and thus, control regulatory costs and relieve regulatory burden" is fundamentally unsound. *See* 86 Fed. Reg. at 2,270. At a minimum, the 2021 Rule burdens grantees by requiring them to spend additional time navigating the confusing patchwork of statutory and regulatory nondiscrimination provisions across HHS programs. Many will be unsure of their legal obligations under local, state and federal law. Likewise, program beneficiaries will not have a straightforward way to determine what protections they are entitled to, making it more difficult for them to safeguard themselves from discrimination. Some may even forgo needed services to avoid the harm of discrimination. Administrative and judicial challenges are sure to follow.

63.    HHS's determination that the 2021 Grants Rule will improve program effectiveness is similarly flawed. Focusing in particular on child welfare programs involving foster care and adoption, HHS concluded that "[r]emoving regulatory barriers to participation of faith-based child placement agencies" would "serve[] the Department's goals of creating more options for children in need of loving homes." *Id.* at 2,270. HHS has only anecdotes, not evidence, to support this disputed theory. HHS cited some commenters' "belie[f] that, with the proposed changes, more children in the foster care system will be able to receive help as there will be more organizations available to provide services"; and (ii) its own "experience and expertise." *Id.* at 2,269, 2,277. These justifications are inadequate in light of other comments and evidence undermining HHS's preordained view. To the extent HHS acknowledged these

27

contrary comments, it either brushed them aside or mischaracterized them. In addition, the 2021

Grants Rule failed both to acknowledge HHS's own findings that equal and safe access by

beneficiaries to programs is a critical, primary, and prevailing consideration when analyzing

program effectiveness and to analyze the costs and benefits of the new 2021 Grants Rule in this

regard.

64.     For instance, HHS noted that "[o]ne commenter faulted HHS for not providing

empirical data to support the contention that the nondiscrimination rule is materially affecting

efforts to find qualified providers," and "another complained that HHS did not present evidence

that a significant number of grantees have been unduly burdened under the current rule." *Id.* at

2,269. Beyond simply reciting these comments, however, HHS made no effort to investigate or

grapple with their substantive concerns.

65.     HHS also acknowledged that "one state indicated that its placement rates and time

in care did not change significantly when 'discriminatory' providers leave the field," but it

disregarded this point because "other states provided the Department with different perspectives

on the issue." *Id.* at 2269 n. 32. In truth, however, HHS received several comments showing that

placement rates in several states and territories, including Massachusetts, Illinois and

Washington, D.C., were not adversely affected when discriminatory providers discontinued their

services.[12] HHS's mischaracterizations are incompatible with its mandate to make reasoned

decisions based on substantial evidence.

---

[12] *See, e.g.*, Colorado Dep't of Human Servs., Comment Letter on 2019 Proposed Rule (Dec. 18, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-118996; State Att'ys Gen., Comment Letter on 2019 Proposed Rule (Dec. 19, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-113346.

66.     Finally, as explained in greater detail in Section D below, HHS's myopic focus on the speculative departure of faith-based organizations from HHS-funded programs ignores the many ways in which those same programs' effectiveness might be reduced if vulnerable beneficiaries are unable to obtain services because of discrimination. For example, the elimination of discrimination by child welfare agencies protects parents and children in the system and makes these programs more available to LGBTQ and minority religion foster and adoptive parents. These are the very types of parents who are seeking to provide loving homes for children who cannot safely return to their own parents, but have been rejected from doing so, as made clear in the very litigation cited by HHS in support of the Rule and in litigation it failed to acknowledge. *See Marouf v. Azar*, 391 F. Supp. 3d 23, 34 (D.D.C. 2019). Because HHS refused to address, let alone evaluate, the 2021 Grants Rule's role in enabling and fostering discriminatory practices against vulnerable populations, its determination that HHS programs will be more effective under the new rule is unsound.

### f.  Legal Obligations

67.     Finally, HHS justified its reversal by asserting that it "is under no legal obligation to impose [the nondiscrimination] requirements and has accordingly decided to remove them." 86 Fed. Reg. at 2,263. This is not a reasoned basis for the change. Agencies frequently promulgate particular rules without a specific command to do so—indeed, that is why regulatory authority is delegated to agencies in the first place—and HHS's legal obligations were the same in 2016 as they are today. HHS is free to change its policy preference, but it must explain itself, which this justification flatly fails to do.

68.     This conclusion is reinforced by the circumstances of HHS's change in position— it contradicts prior factual findings and ignores reliance interests. In the Revised Grants Rule,

HHS insisted that its decision to "'change[] prior policy' is not subject to a heightened justification or standard of review," *id.* at 2,267, and "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better," *id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). In fact, however, the Supreme Court has cautioned that more detailed justifications for a change in policy are required when the "new policy rests upon factual findings that contradict those which underlay [the] prior policy," or when the previous policy has "engendered serious reliance interests that must be taken into account." *Fox Television Stations*, 556 U.S. at 515; *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2177, 2126 (2016); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1913 (2020).

69.     Both predicates are present here: HHS's step backwards in eradicating discrimination flies in the face of years of HHS's own studies,[13] bulletins,[14] trainings,[15]

---

[13] *See, e.g.*, HHS, *Advancing LGBT Health & Well-Being: 2016 Report of the HHS LGBT Policy Coordinating Committee* (2016), https://www.hhs.gov/sites/default/files/2016-report-with-cover.pdf; HHS, OPRE Report #2014-79, *Human Services for Low-Income and At-Risk LGBT Populations: An Assessment of the Knowledge Base and Research Needs* (2014), https://www.acf.hhs.gov/sites/default/files/documents/opre/lgbt_hsneeds_assessment_reportfinal 1_12_15.pdf.

[14] *See, e.g.*, HHS, *The Brooklyn Hospital Center Implements Non-Discriminatory Practices to Ensure Equal Care for Transgender Patients* (July 14, 2015), https://www.hhs.gov/sites/default/files/ocr/civilrights/activities/agreements/TBHC/statement.pdf.

[15] *See, e.g.*, Sylvia Bereknyei et al., *Stopping Discrimination before it Starts: the Impact of Civil Rights Laws on Health Care Disparities* (2009), https://doi.org/10.15766/mep_2374-8265.7740 (a joint project between HHS's Office for Civil Rights, Office of the General Counsel, and Stanford University School of Medicine).

information memoranda,[16] quality improvement centers[17], and policies or practices that have

rightly emphasized how harmful discrimination is to individuals' wellbeing and, conversely, how

important nondiscrimination protections are to ensure all people receive maximum benefit from

services and programs. And HHS's prior focus on eradicating discrimination in its programs

created significant reliance interests among program beneficiaries, program participants, and

advocacy organizations, like Plaintiffs here. Despite receiving numerous comments "stress[ing]

that important reliance interests are at stake," HHS dismissed these concerns as irrelevant

because "the 2016 amendment had been in place less than three years when the Department

issued the proposed rule." 86 Fed. Reg. at 2,262. HHS offered no support for its apparent

conclusion that three years is insufficient time to develop legitimate reliance interests on the

2016 Grants Rule, no acknowledgment that the 2016 Grants Rule was based on an HHS policy

that had been in place since December 18, 2015, *see* 80 Fed. Reg. 72,182 (Nov. 18, 2015), and

no recognition that the nondiscrimination principles underpinning the 2016 Grants Rule date

back even further and are, in some instances, constitutionally mandated regardless. In fact,

assurances requiring grantees to treat LGBTQ beneficiaries, for example, in a nondiscriminatory

way, were contained in HHS grant awards for years prior.

---

[16] *See, e.g.*, Letter from HHS Office for Civil Rights, Administration for Children and Families, and U.S. Dep't of Justice Civil Rights Division, Federal Coordination and Compliance Section (Oct. 2016), https://www.hhs.gov/sites/default/files/title-vi-child-welfare-guidance-10-19-16.pdf (addressing implementation of Title VI of Civil Rights Act in child welfare system) , https://www.courts.ca.gov/documents/ACFMemo.pdf; U.S. Dep't of Health & Human Servs., Administration for Children, Youth & Families, Information Memorandum ACYF-CB-IM-11-03, Lesbian, Gay, Bisexual, Transgender and Questioning Youth in Foster Care (Apr. 6, 2011), https://www.courts.ca.gov/documents/ACFMemo.pdf.

[17] The National Quality Improvement Center on Tailored Services, Placement Stability, and Permanency for Lesbian, Gay, Bisexual, Transgender, Questioning, and Two-Spirit Children and Youth in Foster Care (QIC-LGBTQ2S), *Building knowledge to improve outcomes for LGBTQ2S youth in foster care*, *available at* https://www.qiclgbtq2s.org/.

**D. HHS Failed to Meaningfully Consider the Consequences of Authorizing Discrimination on the Basis of LGBTQ Status and Religion**

70.     Before promulgating the 2021 Grants Rule, HHS was required to consider important aspects of the problems, including important policy effects. Instead, HHS rested its decision on unreasoned justifications (as discussed above) and either ignored or downplayed several key concerns. Crucially, HHS failed to provide meaningful analysis of the consequences that will flow from permitting additional discrimination in federally funded programs. Such discrimination harms beneficiaries, imposes additional barriers to service, causes significant economic costs, undermines HHS's mission to enhance the health and well-being of all Americans, and will lead to worse outcomes in HHS programs and additional societal burdens. HHS's failure to grapple with these issues renders the 2021 Grants Rule arbitrary and capricious under the APA.

71.     HHS's conclusion that the 2021 Grants Rule will not lead to greater discrimination on the basis of religion or LGBTQ status because "[t]his final rule merely removes the regulatory requirement to comply with nonstatutory nondiscrimination requirements," and "grant recipients are still required to comply with the statutory nondiscrimination requirements that are applicable to the programs from which they receive Department funding" is simply not credible. 86 Fed. Reg. at 2,268. HHS's conclusion ignores the basic fact—emphasized repeatedly in the comments—that nonstatutory nondiscrimination requirements are, in several instances, the only express protections in federal law against religious discrimination and sex discrimination, including discrimination on the basis of sexual orientation or gender identity.

72.     For instance, through the Social Security Act Title IV-E program, HHS provides grants to support child welfare programs in foster care, adoption assistance, and kinship guardian

assistance. As mentioned, this statute does not prohibit discrimination in the provision of grant-funded services on the basis of sex (including sexual orientation and gender identity). The Revised Grants Rule thus eliminates the only express federal prohibition on discrimination based on LGBTQ identity by federally funded child welfare agencies and their contractors.

73.     The Revised Grants Rule similarly eliminates the only express federal prohibition on discrimination on the basis of religion against individuals who may not be considered beneficiaries or prospective beneficiaries of the Title IV-E program, such as potential foster or adoptive parents and families. *See* 42 U.S.C. § 671 (prohibiting discrimination based on race, color and national origin, but not sex or religion). Aside from denying prospective loving parents the opportunity to care for a child, removing this protection jeopardizes foster children. In its absence, federally funded agencies providing foster care services can, among other things, keep children in group homes, rather than placing them with qualified parents who do not share the agencies' religious views, or place children with families that share the agencies' religious views, but not the children's.

74.     And, as discussed above, the Revised Grants Rule's reversion to "statutory" nondiscrimination protections creates significant confusion as to whether grantees must still comply with regulatory nondiscrimination protections, including those designed to protect LGBTQ youth through HHS's RHY program. *See* 45 C.F.R. § 1351.22(a). Accordingly, it increases the likelihood of discrimination by recipients of RHY grant funding.

75.     The Revised Grants Rule also abandons the only codified nondiscrimination protections available to most older individuals, who rely on programs that are funded by HHS under the Older Americans Act, which aims to enable older people to age with dignity and remain independent as long as possible. To that end, HHS administers programs that provide a

wide range of home and community-based services, such as home-delivered nutrition services (*e.g.*, Meals on Wheels), congregate nutrition services (*e.g.*, meals served at group sites such as senior centers), in-home chore assistance services, transportation services, legal services, and elder abuse prevention services.[18] The Older Americans Act does not include explicit nondiscrimination provisions, and most states lack explicit non-discrimination protections for the type of home and community-based services provided under the Act. As a result, the 2021 Final Rule effectively sanctions a federally funded senior center's refusal to allow same-sex couples to participate in its couples programs, the refusal of a home health aide working for a federally funded program to care for a transgender older woman, or a federally funded adult daycare center refusal to serve LGBTQ adults.[19]

76.      In addition, the Revised Grants Rule strips protections from individuals struggling with poverty. For instance, the statutes authorizing the Community Economic Development Program and the Head Start program—both of which are intended to benefit low-income families and individuals—do not include independent protections against religious discrimination (although both protect against discrimination on the basis of "race, creed, color, national origin, sex, political affiliation, or beliefs"). *See* 42 U.S.C. § 9821(a); 42 U.S.C. § 9849(a). Thus, by eliminating the universally applicable prohibition against religious discrimination provided by the 2016 Grants Rule, the Revised Rule would not bar grantees of these programs from discriminating against people based on their religious beliefs. Once again, though a preexisting regulation bars religious discrimination against HHS program beneficiaries

---

[18] Congressional Research Service, R43414, Older Americans Act: Overview and Funding 1, 5 (2018), https://crsreports.congress.gov/product/pdf/R/R43414.

[19] Servs. & Advocacy for Gay, Lesbian, Bisexual & Transgender Elders ("SAGE") & the Am. Soc'y on Aging, Comment Letter on 2019 Proposed Rule 4 (Dec. 11, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-44712.

and prospective beneficiaries, these protections are not as expansive as the nondiscrimination

provisions in the 2016 Grants Rule, and the 2021 Grants Rule's reversion to "statutory"

nondiscrimination provisions creates confusion about grantees' obligations under this preexisting

regulation. *See* 45 C.F.R. § 87.3(d). This confusion is magnified by the 2021 Grants Rule's

preamble, which suggests that regulatory protections promulgated pursuant to statutory

rulemaking authority are included, a category of regulations that apparently does not include 45

C.F.R. § 87.3, which was promulgated pursuant to the Housekeeping Statute. Arbitrarily, HHS

fails to consider or address this confusion."

77.     As a final example, HHS made clear in the 2021 Grants Rule that it will not

interpret statutory bans on sex discrimination to prohibit discrimination on the basis of sexual

orientation or gender identity unless and until the Supreme Court's decision in *Bostock v.*

*Clayton County*, 140 S. Ct. 1731 (2020), which concerned the meaning of employment

discrimination "because of sex" for purposes of Title VII, is "extended to other statutory

protections prohibiting discrimination on the basis of sex." 86 Fed. Reg. at 2,267. At a minimum,

HHS's interpretation exacerbates confusion as to whether HHS-funded grants programs

prohibiting discrimination on the basis of sex necessarily bar discrimination on the basis of

LGBTQ identity.

78.     Rather than grapple with the consequences of eliminating regulatory

nondiscrimination protections, HHS simply claimed that it need not worry about increased

discrimination following implementation of the 2021 Grants Rule because "[c]ommenters

offered little evidence" of discrimination "before the current § 75.300(c) and (d) became

effective in January 2017." 86 Fed. Reg. at 2,268. This striking statement cannot be squared with

the record before the agency, which included numerous comments, citing HHS's own research,

studies, and findings, detailing the longstanding discrimination suffered on the basis of religion

or LGBTQ identity, including by youth in the child welfare system or experiencing

homelessness, prospective foster and adoption parents, older people and individuals experiencing

poverty or requiring health and medical care, and the significant harms these individuals face

absent the federal nondiscrimination protections. To name just a few examples:

- Commenters explained that LGBTQ youth are especially vulnerable to discrimination by HHS grantees given their overrepresentation in both the foster care setting and among youth experiencing homelessness. Some commenters pointed HHS to a study showing that LGTBQ youth represent 30.4 percent of the foster care population, even though they comprise only 11.2 percent of youth overall.[20] Another commenter highlighted statistics showing that LGBTQ youth are 120 percent more likely to experience homelessness than their non-LGBTQ peers,[21] and yet another noted that LGBTQ youth comprise 40 percent of all youth experiencing homelessness today.[22] Commenters described how discrimination undergirds this overrepresentation. As one commenter noted, 78% of LGBTQ youth run away from their foster care placements because of hostility they experience based on their sexual orientation or gender expression.[23]

- Commenters further detailed the various forms of discrimination LGBTQ youth experience at the hands of child welfare agencies and their contractors, many of which receive HHS grants, including verbal and physical abuse, a denial of medically necessary health care, refusal to place LGBTQ youth with LGBTQ parents, failure to affirm and support a child's gender identity, and other forms of discrimination.[24] Indeed, one young LGBTQ-identifying woman recently explained that during her 16 years in Ohio's child welfare system, she was often "sexually harassed or told that she was mentally ill" based on her sexual

---

[20] Colorado Dep't of Human Servs., Comment Letter on 2019 Proposed Rule 2 (Dec. 18, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-118996.

[21] Ctr. for Am. Progress, Comment Letter on 2019 Proposed Rule 4 (Dec. 18, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-56146.

[22] GLSEN, Comment Letter on 2019 Proposed Rule 1 (Dec. 19, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-118049.

[23] Texans Care for Children, Comment Letter on 2019 Proposed Rule 1(Dec. 18, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-106668.

[24] *See, e.g.*, Family Equality, Comment Letter on 2019 Proposed Rule 3 (Dec. 19, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-111063 (pointing to "real life stories of discrimination" presented in Family Equality's *amicus curiae* brief in a recent Third Circuit case that is now pending review by the Supreme Court).

orientation and identity.[25] Another commenter relayed the results of a 2017 survey of 2,500 foster youth, which showed that LGBTQ foster youth of color were 65% more likely to report having more than ten placements than their white, non-LGBTQ peers.[26]

- Commenters also identified similar discrimination against LGBTQ youth experiencing homelessness. HHS provides significant grant funding for homelessness services. For example, some providers impose discriminatory conditions on their services, forcing LGBTQ youth to choose between forgoing services altogether or accepting housing arrangements, clothing, and other services that deny their sexual orientation or gender identity.[27]

- Commenters also detailed discrimination within the foster care system on the basis of religion. For instance, one commenter noted that Miracle Hill Ministries, a Christian child welfare agency in South Carolina, subject to the Grants Rule, refused to accept a woman as a volunteer mentor for foster children because she was Jewish and denied another woman the ability to foster children through the agency because she was Catholic.[28] Similarly, another commenter detailed discrimination against a Muslim woman in Baltimore, Maryland, whose application to be a foster parent was denied because she would not allow pork products in her home.[29]

- Another commenter highlighted the experience of a Muslim foster child who was placed in a non-Muslim home. Though the youth explained to their foster parents that they could not eat pork because of her religion, the foster parent was unwilling to serve anything else. After a week of refusing dinner, the foster child finally gave in: "When I first broke my religious practices, I was so angry and

---

[25] Am. Bar Ass'n, Comment Letter on 2019 Proposed Rule 5 (Dec. 16, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-36147.
[26] CLASP, Comment Letter on 2019 Proposed Rule 3 (Dec. 19, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-118956.
[27] Caitlin Rooney et al., Ctr. for Am. Progress, Discrimination Against Transgender Women Seeking Access to Homeless Shelters (2016), https://www.americanprogress.org/issues/lgbtq-rights/reports/2016/01/07/128323/discrimination-against-transgender-women-seeking-access-to-homeless-shelters/ (cited in materials provided to HHS by the State Attorneys General of California, Massachusetts, Pennsylvania, Colorado, Delaware, District of Columbia, Hawai'i, Illinois, Iowa, Maryland, Minnesota, Nevada, New Jersey, New York, North Carolina, Rhode Island, Vermont, Virginia, and Washington).
[28] Muslim Advocates, Comment Letter on 2019 Proposed Rule 6 (Dec. 12, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-53120.
[29] Nat'l Ctr. for Lesbian Rights, Comment Letter on 2019 Proposed Rule 11 (Dec. 19, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-119114.

upset because it was forced on me, it was either not eat or go against my own religious practice. This should have never happened to me as a child."[30]

- Outside the foster care and adoption setting, commenters highlighted older LGBTQ people's decades-long experiences with discrimination. Successful aging requires competent healthcare, economic security, and strong family and social support. But, as commenters explained, due to the cumulative effect of a lifetime of discrimination and stigma, LGBTQ older people face significant disparities in these areas when compared to their non-LGBTQ peers—disparities that profoundly impact their quality of life.[31] They are often socially isolated and vulnerable, having relied largely on a smaller circle of chosen family and friends throughout their lives, as a result of family rejection and legalized discrimination.[32] And for most of their lives, LGBTQ older people have been unable to take advantage of the significant health benefits afforded by the protections associated with marriage.[33]

- Commenters described how preexisting vulnerabilities are exacerbated by the continued discrimination LGBTQ people face in obtaining various services, of the type funded by the Older Americans Act.[34] One commenter pointed to a study showing that 28 percent of area agencies reported that LGBTQ seniors might not be welcomed by local senior service agencies, which provide services like senior centers and group meal programs, and LGBTQ older people who are in residential care facilities have been subjected to discrimination, harassment and physical segregation.[35] As the commenter observed, fear of such discrimination often leads LGBTQ older people to delay or decline enter residential facilities, to the detriment of their own health and well-being.[36]

- Commenters also discussed LGBTQ individuals' unique challenges with obtaining economic security and adequate health care. Commenters identified for HHS the high rates of poverty among LGBTQ individuals nationwide (21.6 percent, compared to a national poverty rate of 11.8 percent), and LGBTQ individuals' higher rates of food insecurity, housing insecurity, homelessness than non-LGBTQ individuals.[37] As commenters explained, these economic hardships render many LGBTQ individuals dependent on adequate assistance from HHS

---

[30] Youth Fostering Change, Comment Letter on 2019 Proposed Rule 3-4 (Dec. 18, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-119055.

[31] Servs. & Advocacy for Gay, Lesbian, Bisexual & Transgender Elders ("SAGE") & the Am. Society on Aging, Comment Letter on 2019 Proposed Rule 4 (Dec. 11, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-44712.

[32] *Id.*

[33] *Id.*

[34] *Id.* at 6-7.

[35] *Id.* at 6.

[36] *Id.* at 7.

[37] *Id.* at 6.

programs and grantees, which the 2021 HHS Grants Rule threatens to undermine.[38]

- In this regard, commenters stressed the discrimination LGBTQ individuals face in the health care setting, including providers denying treatment based on sexual orientation; providers refusing to recognize LGBTQ patients' family, including children or same-sex spouses; and providers targeting LGBTQ patients with verbal or physical abuse.[39] According to one survey, 20 percent of LGBTQ women avoided going to a doctor or seeking health care for fear of discrimination.[40]

79.     HHS's refusal to acknowledge, consider, or evaluate the vast chronicling of discrimination in the record violates the agency's obligation under the APA to reach a decision that takes into consideration the evidence and record before it.

80.     Moreover, even setting the public comments aside, HHS's determination that discrimination would not increase following promulgation of the 2021 Grants Rule is irreconcilable with the agency's own proffered justifications for implementing the rule—namely, to *allow* discrimination so as to ensure that faith-based organizations that "provide[] a substantial percentage of services pursuant to some Department-funded programs" and that "would leave the program(s) and cease providing services rather than comply" with the 2016 Grants Rule instead continue to provide services on their preferred, discriminatory terms. *Id.* at 2,262.

81.     HHS also wrongly concluded that discrimination will likely not increase because grantees may never have complied with the 2016 Grants Rule's requirements in the first place, in part because HHS did not enforce them after the change in Administration in January 2017, *id*. at 2,273-74, a fact that HHS itself acknowledges in the 2021 Rule, *id*. at 2273. HHS's logic is completely circular; it hinges on effective nullification of the 2016 Grants Rule. The relevant

---

[38] *Id.*
[39] *Id.* at 7.
[40] Ctr. for Am. Progress, Comment Letter on 2019 Proposed Rule 2-3 (Dec. 18, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-56146.

question for HHS to consider, however, is not how the 2021 Grants Rule would affect discrimination vis-à-vis a gutted and enervated 2016 Grants Rule, but rather, how the 2021 Grants Rule would affect discrimination as compared to a world where nondiscrimination provisions were robustly communicated, implemented, and enforced.

82.     In addition, with respect to the very few specific examples of potential discrimination that HHS deigned to address, it dismissed critical issues on speculative or erroneous grounds. For instance, HHS rejected concerns that participation by discriminatory foster care agencies in HHS's child welfare programs could prevent qualified individuals from becoming foster or adoptive parents "because there are other agencies that would welcome their participation." *Id.* at 2,269. This position necessarily assumes that there are sufficient and adequately resourced nondiscriminatory organizations in each region, including small towns and rural areas, that can serve prospective parents as well as discriminatory organizations could—an assumption for which HHS offered no evidentiary support. It also ignores violations of the Establishment and Equal Protection clauses where religious litmus tests are used to limit participation in government programs or only some individuals can access all government programs and others cannot. Similarly, HHS dismissed concerns that the 2021 Grants Rule could restrict access to HIV prevention and treatment by pointing to section 504 of the Rehabilitation Act of 1973, which "prohibits discrimination on the basis that an individual has HIV." *Id.* at 2,268. In truth, however, section 504 only bars discrimination by HHS grantees against a qualified individual "*solely* by reason of his or her" HIV-status. 29 U.S.C. § 794(a) (emphasis added); *see also* 42 U.S.C. § 12102; 45 CFR § 35.108(d)(2)(iii)(J). There is more than ample reason to think that a discriminatory health care provider might deny treatment or service to an

LGBTQ individual only partially based on his or her HIV-status, and also based on his or her sexual orientation or gender identity or other non-merit factor.

83.     HHS also rejected opposition to the 2021 Grants Rule by encouraging commenters who "view statutory nondiscrimination provisions as insufficient" to "address that issue with Congress." 86 Fed. Reg. at 2,268. But HHS never denied that it had authority to promulgate universal nondiscrimination protections and cannot justify rolling back those protections—which the record has shown to be in the public interest—on the grounds that the agency must wait for Congress to grant the same authority more explicitly. Directing the very individuals whom HHS is meant to protect to petition a different branch of government where HHS has not concluded that it lacks authority on this basis is arbitrary and capricious.

**E.  HHS Has Failed to Reasonably Assess the Costs Associated with the Revised Grants Rule.**

84.     In issuing the 2021 Grants Rule, HHS concluded that the new rule is "not economically significant," has "no economic impact," has "no impact beyond providing information to the public," and would "impose only de minimis costs, if any, on covered entities." 86 Fed. Reg. at 2,271, 2,274, 2,276.

85.     As noted above, HHS has failed to consider the many economic and non-economic costs associated with stripping nondiscrimination protections from HHS grant programs. Without such protections, LGBTQ individuals are often denied or delayed in their access to health and human services, which can result in significant costs to their health, safety, family well-being, and housing and economic stability. This includes, for instance, the stigmatic injury to LGBTQ families whose suitability to parent is questioned because of their identity, the economic injury to LGBTQ parents who are denied access to after-school programs or child care assistance for their children, and the health damage to LGBTQ individuals, including youth in

foster care, who are denied access to timely medical care and treatment. HHS also failed to

consider the negative health effects and corresponding economic costs individuals suffer upon

experiencing discrimination[41] or the increased costs non-discriminating HHS grant recipients

(and non-recipients) will incur to serve program beneficiaries who have been refused assistance

by discriminating grantees.

86.     Moreover, HHS's conclusion that the Revised Grants Rule will have no economic

impact on a substantial number of small entities that apply for HHS grants is itself illogical. HHS

justified the rule change by claiming that compliance with the 2016 Grants Rule would "reduce

the effectiveness of Department-funded programs" by leading "certain grantees and subgrantees"

with religious objections to "cease providing services if forced to comply with § 75.300(c) and

(d)." 86 Fed. Reg. at 2,262. According to the 2021 Grants Rule, those grantees purportedly

"provide a substantial percentage of services to some Department-funded programs and are

effective partners of federal and state governments in providing such services." *Id*. If HHS were

correct that the 2021 Grants Rule is necessary to ensure that certain grantees who provide a

"substantial percentage of services" are able to continue accepting HHS funds—a justification

that has not been substantiated—then the 2021 Grants Rule will certainly have an economic

impact on those grantees.

87.     HHS's determination that the rule has no impact on family well-being is similarly

unreasoned. As discussed above, eliminating the nondiscrimination protections in the Grants

Rule will likely affect income, safety, health and stability for many families, particularly families

within the LGBTQ community and of non-majority faith traditions. HHS's contrary conclusion

---

[41] *See* Nat'l Ctr. for Transgender Equality, Comment Letter on 2019 Proposed Rule 19 & nn.115-16 (Dec. 19, 2019) (detailing the negative effects of experiencing discrimination on morbidity, mortality and health care costs).

is premised, yet again, on the assumption that there has not been and will not be discrimination against program beneficiaries, and any discrimination by faith-based child placement agencies would be mediated by "the availability of secular child placement organizations that are able to work with prospective foster and adoptive parents and families with whom some faith-based organizations cannot work." 86 Fed. Reg. at 2,277. Once again, these assumptions are unsupported, unreasoned, and arbitrary and capricious under APA.

**F.  The 2021 Grants Rule Directly and Irreparably Harms Plaintiffs and the General Public.**

88.     The 2021 Grants Rule harms all Plaintiffs by imposing substantial confusion regarding the legal obligations of grant recipients and the right of the populations they serve to be free from discrimination. Under the 2016 Grants Rule, all HHS grant recipients were subject to the same nondiscrimination prohibitions, which protected against discrimination on the basis of any non-merit factor, including age, disability, sex, race, color, national origin, religion, sexual orientation, or gender identity. In the absence of those anti-discrimination provisions, grant recipients are subject to a patchwork of federal and state statutory and regulatory protections, which vary wildly from program to program, and from state to state. The Revised Grants Rule creates additional confusion as to other regulatory nondiscrimination protections and by refusing to clarify that, following *Bostock*, all HHS grant programs that prohibit discrimination on the basis of sex necessarily include in that prohibition discrimination on the basis of LGBTQ status. As a result, and as detailed below, Plaintiffs will need to divert significant time and resources to responding to the Rule, including by educating the public on the patchwork of protections that remain in place and revising their advocacy strategy to combat the ill-effects of the Revised Grants Rule.

89.     The 2021 Grants Rule will also cause immediate and irreparable harm to members

of the general public, including children currently in need of foster or adoption placements;

families, including prospective foster and adoptive parents; individuals who rely on community

social support services, like Head Start and Meals-on-Wheels; and older Americans. As detailed

above, individuals will not only face the demeaning and stigmatic injury of increased

discrimination, but also will suffer worse outcomes in terms of health, wealth, and well-being if

they are denied access to or choose to avoid HHS-funded programs because of increased

discrimination by HHS grantees or sub-grantees. This, too, will increase the economic costs to

Plaintiffs, who will need to devote more time, energy and resources to finding ways to assist

individuals absent these core nondiscrimination protections from the federal government.

    a.  <u>FFCA</u>

90.     The 2021 Grants Rule will harm both FFCA's members and FFCA in its own

right. Alaska has very few state-based protections for LGBTQ people, including LGBTQ youth

in foster care. Unlike many states, Alaska has no affirmative protections for LGBTQ youth in the

child welfare system.[42] It also does not provide affirmative protections for LGBTQ families,

including relatives, and prospective LGBTQ foster or adoptive parents. Nor does it provide

explicit protections against discrimination on the basis of religion. These gaps were remedied in

part by the 2016 Grants Rule, which created new uniform nondiscrimination protections that

apply to state child welfare systems that receive HHS grant funds and did not previously exist,

---

[42] *Alaska's Equality Profile*, Movement Advancement Project,
https://www.lgbtmap.org/equality_maps/profile_state/AK (last visited Feb. 2, 2021); *State-by-State Analysis of Child Welfare Systems*, Lambda Legal, https://www.lambdalegal.org/child-welfare-analysis#ak (last visited Feb. 2, 2021).

and conformed federal law with constitutional protections for children placed in government care and placed out of home.

91.     Because the 2021 Grants Rule removes those protections, it will cause immediate and irreparable harm to FFCA's youth members. FFCA's members, including some currently in foster care, have reported that they have suffered discrimination based on their LGBTQ status or religion while in foster care. As to the former, the majority of FFCA members who identify as LGBTQ have experienced discrimination in some form while in the foster care system. For example, some FFCA members have reported being placed in congregate care settings because there were no foster homes available that would accept their LGBTQ identity. It is well documented by researchers—and by HHS' Administration for Children and Families itself ("ACF")[43]—that congregate care leads to poorer outcomes than family settings and can be "detrimental to the growth and well-being of youth" and children.[44] Among other reasons, this is because children require healthy attachments to parental figures who are consistently available over an extended period of time.[45] These types of healthy, secure relationships are much less likely to occur in group homes.[46] FFCA sees that its LGBTQ members are disproportionately placed in group homes or other congregate care settings and exit care without permanency— neither returning home to their parents, nor finding a placement with a family through a guardianship or adoption.  Many leave without any permanent connection to an adult as required

---

[43] Children's Bureau, *A National Look at the Use of Congregate Care in Child Welfare* 1 (May 13, 2015), https://www.acf.hhs.gov/sites/default/files/documents/cb/cbcongregatecare_brief.pdf ("[T]here is a consensus across multiple stakeholders that most children and youth . . . are best served in a family setting.").
[44] American Orthopsychiatric Association, *Consensus Statement on Group Care for Children and Adolescents*, 84 AM. J. OF ORTHOPSYCHIATRY 219, 220 (2014).
[45] *Id.*
[46] *Id.* at 221.

under federal child welfare law.  Research, including research funded by HHS's ACF, confirms

that LGBTQ youth are placed in congregate care at higher rates than their non-LGBTQ peers,

face an increased risk of emotional and physical harm in those settings, and exit to homelessness

at higher rates.[47]

92.     When FFCA members who identify as LGBTQ do find placements, some of their

foster families often subject them to verbal abuse, ostracization, and rules that unfairly target

their sexual orientation or gender identity, such as being forbidden to date. Similarly, they may

not be allowed to learn about their LGBTQ identity through LGBTQ support services or LGBTQ

media, or to attend local LGBTQ events, such as Anchorage's annual LGBTQ Pride celebration

and associated educational and social events. Under such conditions, many of FFCA's LGBTQ

members have been forced to move placements or run away. FFCA members have also suffered

discriminatory treatment from caseworkers and other professionals, including: forced so-called

conversion therapy; the use of derogatory slurs; a denial of medically necessary care for a

gender-transition; a refusal to use a youth's preferred name or pronoun; a refusal to provide

clothing consistent with a youth's gender identity; a refusal to refer youths to LGBTQ support

services; prohibitions on having a roommate due to being presumed a threat; and a tendency to

blame a youth for any conflicts that result from the discriminatory treatment they experience in

their foster placements. Several FFCA members have even been charged and convicted of

juvenile or criminal charges, such as sexual assault, following consensual same-sex sexual

---

[47] Bianca D.M. Wilson et al., *Sexual and Gender Minority Youth in Foster Care: Assessing Disproportionality and Disparities in Los Angeles* 6 (2014),
https://williamsinstitute.law.ucla.edu/wp-content/uploads/SGM-Youth-in-Foster-Care-Aug-2014.pdf; U.S. Dep't of Health & Human Servs., Children's Bureau, *Supporting Your LGBTQ Youth: A Guide for Foster Parents* 5 (2013),
https://www.childwelfare.gov/pubPDFs/LGBTQyouth.pdf.

encounters while in care. Based on FFCA's experience with both non-LGBTQ and LGBTQ members, it strongly believes these charges were brought as a result of its members' LGBTQ identities. These traumatizing criminal convictions have had lasting emotional and collateral consequences for those members, including difficulties finding employment and housing.

93.     With respect to religious discrimination, FFCA members have been made to comport their appearance, behavior, and practices to the religious views of their foster families rather than their own. FFCA members have also been forced to abandon or hide their religion and practice the religion of their foster families instead, including by being made to regularly attend religious services for a religion other than their own. Despite receiving numerous complaints about these practices, the Alaska Department of Health and Social Services has continued to place children with discriminatory child welfare providers.

94.     Based on FFCA's experience and that of its members, the 2021 Grants Rule significantly increases the likelihood that FFCA members, and other youth in foster care, will experience discrimination in the future. Child welfare agencies and their contractors, grantees, and other service providers will likely inflict various forms of discrimination on LGBTQ youth, including attempts to disparage or "change" their identity, abuse, denial of behavioral health and medical care, improper and harmful home placements, refusals to acknowledge or support youth's gender identity and gender expression, and similar discrimination. In addition, as a result of the 2021 Grants Rule, child welfare contract agencies could keep foster children in group homes rather than placing them with qualified parents who do not share the agencies' religious views. Under the 2021 Grants Rule, they could also prioritize foster parents' rights to proselytize or engage in faith-based condemnation of a youth's identity rather than protecting the youth's right to be free from such discrimination and harm.

95.     Thus, as a result of the rule change, FFCA members will be forced into making choices to remain in discriminatory situations due to fear of retaliation for speaking out or fear of the unknown. FFCA members in care are told "this placement is the only one we have for you" or "you are lucky I found a place for you because you are transgender." That means a youth must choose between the threat of continued discrimination and the fear of a potential worse placement or going into the shelter system for youth experiencing homelessness, where they also face an increased risk of discrimination. Some homelessness service providers have frequently discriminated against LGBTQ youth by imposing discriminatory conditions on their services and forcing LGBTQ youth to choose between forgoing services altogether or accepting arrangements incompatible with their sexual orientation or gender identity. Such providers also subject LGBTQ youth to messages reproving their sexual orientation or gender identity.

96.     In addition to irreparably harming FFCA's members, the 2021 Grants Rule also harms FFCA in its own right because it conflicts with, impairs, and frustrates FFCA's mission and activities by impeding its ability to improve the health, safety, and well-being of foster children in Alaska. If the 2021 Grants Rule goes into effect, FFCA will be forced to divert valuable staff time and resources to combat the Rule's harmful effects on FFCA's work.

97.     To begin, FFCA's direct assistance to individual LGBTQ members will become more time-consuming and difficult as those members experience increased discrimination as a result of the 2021 Grants Rule. As noted above, FFCA spends staff time advocating on behalf of individual foster children to the Alaska Department of Health and Social Services to ensure that its members receive the services they need and to address discrimination against its members on the part of caseworkers, service providers, staff at facilities and group homes, and foster parents. In FFCA's experience, it spends more time assisting its LGBTQ members relative to their non-

48

LGBTQ peers as result of such discrimination. For example, FFCA has in the past spent staff time and resources on the following activities: advocating for members who are not receiving gender-affirming health care to support their transition and improve their emotional wellbeing and physical safety; reminding agency caseworkers and other staff that it is in FFCA's transgender and non-binary members' best interests, consistent with child welfare professional standards and social science, to refer to them by the name and pronouns that they use; supporting LGBTQ youth who have experienced suicidal ideation or self-harm when they have been refused service or been discriminated against by mental health providers; and helping youth to find housing when they have been kicked out or have run away from a discriminatory foster home or congregate care placement. As a direct result of the 2021 Grants Rule, FFCA anticipates that its LGBTQ members will experience more discrimination, which will force FFCA to divert more staff time towards directly assisting its LGBTQ members and away from FFCA's other important work, such as providing educational programming for all of its members.

98.     The 2021 Grants Rule will also make it more difficult for FFCA to support its members in successfully transitioning to adulthood due to an increase in discrimination-related trauma and harm. In FFCA's experience, its LGBTQ members who are out of care disproportionately experience homelessness, substance abuse, and criminal justice involvement when they experience trauma and harm while in the system. In January 2021, for example, FFCA expended staff time assisting a transgender female member who was charged with a crime and was placed in the men's unit in the local jail, placing her safety at risk. For its alumni members who are LGBTQ and experiencing homelessness, FFCA expends resources helping them navigate the local shelter system, which is largely run by faith-based HHS grantees and has not been safe and affirming.  This work will be more time consuming under the 2021 Grants Rule,

limiting FFCA's ability to reach as many children as possible, and may ultimately be less successful.

99.     FFCA's ability to empower youths through educational and training activities will also be impaired by the 2021 Grants Rule in at least two ways. First, the Rule will undermine FFCA's current curriculum for its Independent Living trainings on the legal rights of youth in foster care. Under the 2016 Grants Rule, FFCA was able to explain to youths that they were protected from discrimination on the basis of their sexual orientation, gender identity, and religion. This empowered FFCA's members to advocate for themselves and to reach out to FFCA for help when they experience discrimination. Under the 2021 Rule, however, FFCA will no longer be able to include this information in its training. As a result, FFCA will be forced to spend staff time and resources adapting its curriculum for those trainings. Second, the 2021 Grants Rule will make other educational materials less effective. For example, FFCA is currently working to develop a handbook on the legal rights of foster youth that will be disseminated to both youth and professionals. If the 2016 Rule were to remain in effect, FFCA's handbook would be able to cite clear and universal federal nondiscrimination protections at the federal level that would in turn empower youth and other professionals to advocate on their behalf. This handbook would allow youth to have a clear picture of what their rights are when they enter care so they can advocate for themselves. In addition, a youth's guardian ad litem (best interests advocate) or attorney can use the handbook to help educate a youth about their rights and open up conversations and advocacy opportunities that will prevent harm. The handbook will also be useful as a training tool for judges and other child welfare professionals to ensure all participants in the child welfare system have the same information and expectations. Under the 2021 Grants

Rule, FFCA will not be able to include those protections in the handbook, rendering it a less effective advocacy tool.

100.     Finally, FFCA will be forced to expend greater staff time and resources advocating in front of state and local policy makers to provide safe and affirming environments for its members in care and to take action against providers and foster parents who have discriminated and continue to discriminate.  The 2016 Rule is a clear, concise way to explain to state and local policy makers why Alaska law, policy, and practice should conform to federal law and protect youth. Without it, FFCA will be required to piece together other arguments such as professional standards and constitutional guarantees that are more complicated and time consuming to piece together and explain.

  b.  Family Equality

101.     The 2021 Grants Rule conflicts with, impairs, and frustrates Family Equality's mission and activities. As described in more detail below, Family Equality previously relied on HHS's 2016 Grants Rule to help ensure that adoption and foster care service providers do not discriminate against LGBTQ youth in the child welfare system or LGBTQ adults, including families of origin, kin, and potential foster or adoptive parents. By removing the 2016 Grants Rule's protections, the 2021 Grants Rule impedes Family Equality's ability to ensure that foster care and adoption services are safe and affirming for LGBTQ youth and non-discriminatory for LGBTQ parents, potential parents, kin, and guardians.[48] The rule also impedes Family Equality's

---

[48] *See generally* Family Equality, Comment Letter on Proposed Rule on Health and Human Services Grants Regulation (Dec. 19, 2019), https://www.regulations.gov/document?D=HHS-OS-2019-0014-111063(describing the myriad of harms the 2021 Grants Rule will cause to LGBTQ families and youth in foster care).

ability to educate and empower LGBTQ families and youth to advocate for themselves. As a result, the rule will cause Family Equality irreparable injury in the following ways.

102.    First, Family Equality has responded to the confusion that the Notice of Nonenforcement began and the 2021 Grants Rule continues by conducting a widespread and comprehensive education and outreach campaign to ensure that child welfare agencies receiving HHS grant funds understand the impact of the agency's actions and the importance of not discriminating against LGBTQ youth and families. Specifically, Family Equality has already spent approximately 40 hours of staff time assessing the legal effect of the 2021 Grants Rule, working with other organizations to identify and understand the nondiscrimination protections left in place for HHS's many grant programs. Family Equality has also spent at least 15 hours analyzing the Rule's impacts on youth and families, such as the likelihood that increased discrimination will lead to fewer placements and kinship care opportunities, including by conducting research, reading journal articles, and speaking with experts at other organizations. Additionally, Family Equality has spent approximately 20 hours identifying and interviewing LGBTQ families and youth that have experienced discrimination in the foster care system to better understand the impacts of HHS's action. Family Equality has spent 15 hours researching other statutory and regulatory foundations for combatting anti-LGBTQ discrimination in child welfare, such as statutory requirements in child welfare to act in the best interests of children.

103.    Relying on this research and analysis, Family Equality has spent approximately 100 hours creating and disseminating educational materials, including: email action alerts sent to Family Equality's full network of constituents and partner organizations; online and written resources and publications for child welfare professionals and advocates, LGBTQ parents, LGBTQ youth, faith-based organizations and advocates, civil rights organizations, and other

allied individuals and organizations engaging on this issue; and various forms of social media.

Family Equality has also spent at least another 35 hours preparing for and conducting informal

briefings via conference call for partner organizations, and approximately 35 hours on media

relations, including press releases, securing interviewees for stories, responding to media

inquiries, and providing press interviews. With the implementation of the 2021 Grants Rule and

the lack of explicit protections at the federal level, the framework of Family Equality's education

and outreach campaign will necessarily shift to providing resources, data, and information

regarding the consequences of discrimination as well as the benefits to children, families and

communities of nondiscrimination. Family Equality will also shift its work to encouraging states

and state-contracted agencies to voluntarily implement non-discriminatory policies and

procedures in an effort to ameliorate the impact of the loss of explicit federal protections.

Further, Family Equality will need to focus its education efforts on best practices on working in

coalition to develop and disseminate best practices to agencies for providing affirming care to

LGBTQ youth and families in order to achieve improved outcomes for children and families, and

on reaching out to LGBTQ prospective parents and young people to help them find affirming

service providers.

104.    Collectively, Family Equality has diverted well over 225 hours of staff time

responding to the 2021 Grants Rule through its public outreach and education campaign, and it

expects to continue to expend significant staff time on these efforts going forward. This diverts

valuable staff time and resources away from Family Equality's state work and other projects on

the federal level, including its work to promote the Every Child Deserves a Family Act—

proposed legislation that would provide robust statutory protections for LGBTQ families and

youths in the child welfare and foster care systems—as well as its work on a variety of other policy issues important to its mission, such as paid leave, healthcare, and housing.

105.    Second, the 2021 Grants Rule will make Family Equality's work with young people and families significantly more difficult, time consuming, and less effective. To raise awareness about discrimination against LGBTQ young people and families and generate public support for nondiscriminatory policies, Family Equality: (i) educates young people and families about their rights, (ii) encourages families to file complaints with government oversight and enforcement offices (such as HHS's Office of Civil Rights ("OCR")) when their rights are violated by federally funded service providers, and (iii) encourages families to generate awareness and support by their telling their stories through social and traditional media. These efforts are, in turn, critical to Family Equality's ability to improve outcomes for families more broadly.

106.    When young people or families file complaints of discriminatory treatment with HHS's OCR, that office is tasked with investigating and, when justified, acting in response. Family Equality spends staff time and resources encouraging young people and families to file complaints regarding discriminatory treatment they experience in child welfare programs with HHS's OCR and educating its partners about the importance of encouraging LGBTQ young people and families to file complaints. These complaints establish a record of discrimination, which is useful to establish trends that Family Equality can use as a basis to encourage HHS to adopt policies that promote LGBTQ equality, including the 2016 Grants Rule, as well as other polices such as standards for developing best practices for affirming care and treatment for LGBTQ youth, families of origin, kin, and prospective families, and training agencies in implementing those policies. Also, if HHS takes action in response to harmful discrimination to

youth and families by a federally funded service provider, that provides case-specific "precedent" that Family Equality can use to discourage other agencies from taking similar actions. The 2016 Rule provided a clear and holistic basis for a complaint filed by LGBTQ families and youth who experienced discrimination. The 2021 Grants Rule makes this work more difficult. In Family Equality's experience, the Nonenforcement Policy deterred families and youth from filing complaints because they believed that doing so was unlikely to be productive. The 2021 Grants Rule will only exacerbate this deterrence because youth and families know that HHS may dismiss their complaint out of hand because sexual orientation and gender identity are not explicitly protected. As such, if the 2021 Grants Rule goes into effect, Family Equality will need to spend additional staff time exploring alternative legal bases for protections for LGBTQ families and youth who experience discrimination, and disseminate that information through its networks in hopes of countering the deterrent effect of the Rule and encouraging those who experience discrimination to file a complaint.

107.    Similarly, sharing young people's and families' stories helps build the awareness and social momentum necessary to prompt social change benefitting LGBTQ youth and families. When Family Equality carries out its advocacy efforts in states that do not have nondiscrimination protections in place—or the existing protections are not comprehensive— providing lawmakers with personal stories of discrimination faced by LGBTQ youth, families, kin, or prospective parents in their state is one of the most effective means of demonstrating to lawmakers the importance of legislation or regulatory protections. For example, when a southern state introduced a child welfare license-to-discriminate bill, Family Equality sought out LGBTQ youth with lived experience in care, connected them with local advocacy groups, and worked with them to elevate their stories to lawmakers and the general public through written testimony

and op-eds. Family Equality believes that the humanizing impact of such storytelling is essential to helping the public empathize with the experiences of discrimination many LGBTQ youth and families face. As part of this work, Family Equality establishes relationships with young people and families, earns their trust, and translates their lived experiences into narratives that can be shared with broad audiences. Additionally, Family Equality formed a Youth Advisory Council as part of the Every Child Deserves a Family Campaign. Family Equality has spent 20 hours educating the youth on the advisory council on the 2016 Grants Rule, then the Notice of Nonenforcement, and now the 2021 Grants Rule to help them understand the changing landscape of federal protections so they could advocate, testify, and educate other youth with lived experience in foster care and guide them in their own advocacy.

108.    The 2021 Grants Rule will impair this work. Family Equality has observed that the Notice of Nonenforcement has deterred young people and families from being willing to describe their experiences, and Family Equality anticipates that the 2021 Grants Rule will exacerbate this hesitancy. Individuals who have ongoing relationships with a provider, such as a case worker or foster placement agency, are reasonably afraid of discriminatory retaliation by that provider or the government agency that contracts for such services or licenses homes if they speak out about their discriminatory treatment. LGBTQ foster and adoptive parents reasonably fear that demeaning comments will increase in frequency and scope—sometimes attempting to undermine their relationship with the child(ren) placed with them, or worse—that their children will be removed from their homes, adoptions thwarted, and certifications that involved significant time in paperwork, training, and home studies, not to mention the emotional investment of being a foster parent, taken away. This fear is exacerbated by the 2021 Grants Rule and its elimination of nondiscrimination protections. For example, Family Equality spoke with a

lesbian couple who were nearing the end of two-years' worth of delays in their process of

adopting their son, who had been placed with them since birth. They were in a southern state

without explicit nondiscrimination protections in state law and had endured discriminatory and

degrading comments from a social worker because of their sexual orientation (including in front

of their young son) and several unnecessary delays that had dragged out the process. While they

had a compelling story, they were afraid to speak out publicly, not only due to the concrete

dignitary harm of facing further insults from the social worker, but also because they were afraid

the social worker would further delay the adoption process—or worse, prevent them from

adopting their son at all and take him from the only home he had ever known. In the absence of

protections, they decided the risk of publicly telling their story was too high. As this example

shows, Family Equality has had much greater difficulty convincing people to share their

experiences of discrimination and has been forced to divert more staff time to finding families

and building the trust necessary to convince them to make their experiences public. These harms

will only be heightened if the 2021 Grants Rule goes into effect as families and youth will no

longer be explicitly protected under the Title IV-E programs from discrimination on the basis of

religion, sex, sexual orientation, or gender identity.

109.    Third, Family Equality previously relied upon the 2016 Grants Rule in its work to

defeat proposed legislation and repeal harmful laws in states throughout the country, such as

license-to-discriminate laws that affirmatively permit state-licensed child welfare agencies to

refuse to provide services to and place children with LGBTQ people and same-sex couples if

doing so conflicts with an agency's religious belief, some of which allow discrimination against

LGBTQ children when providing services to them. As part of that work, Family Equality

educates state legislators and policymakers on the impacts such laws have on LGBTQ families

and youth. When the 2016 Grants Rule was in place, Family Equality was able to explain to state policymakers that HHS preempted any such license-to-discriminate laws for recipients of federal funds. Without that tool, Family Equality's efforts to prevent or repeal discriminatory state legislation will be less effective. For example, when working to repeal a license-to-discriminate law in a southern state in recent years, Family Equality collaborated with certain state legislators to educate their colleagues on the preemptive effect of the 2016 Rule's federal nondiscrimination protections. Going forward, Family Equality will no longer be able to do so. During this session, Family Equality has had to explain to legislators, as well as other in-state partners and state contracted agencies, the impact of the Notice of Nondiscrimination and the 2021 Grants Rule. Family Equality anticipates more state-based efforts to enact such harmful laws as the COVID-19 pandemic recedes and state legislators are able to return to their normal work. The elimination of federal protections will provide additional motivation for lawmakers seeking to pass these laws. Accordingly, Family Equality anticipates having to divert substantial staff time and resources on an ongoing basis in the future.

      c.   <u>True Colors United</u>

110.    The Revised Grants Rule conflicts with, impairs, and frustrates True Colors United's mission and activities by impeding its ability to ensure that homelessness services are safe for LGTBQ youth and more broadly, to end youth homelessness. Specifically, the Rule impairs True Colors United's ability to provide services related to youth experiencing homelessness and causes irreparable injury in the ways discussed below.

111.    First, the 2021 Grants Rule eliminates clear and consistent nondiscrimination requirements for HHS service providers with whom True Colors United works and will thus cause confusion as to what nondiscrimination requirements continue to apply to those service

providers. As a result, True Colors United will need to devote some of its limited staff time to understanding and explaining to service providers the applicable nondiscrimination protections.

112.    For example, youth homelessness service providers often receive funding for a range of programs through various federal funding streams, including funding from RHY program grants (through HHS), other HHS funding streams (such as grants for substance abuse and mental health through Substance Abuse and Mental Health Services Administration programs or federal child welfare funds as they flow to states and their contract service providers), and funding from the Department of Housing and Urban Development, among others. They may also receive other HHS grant funding for related programs, such as food support or healthcare services. The statutes authorizing these various HHS programs do not have consistent nondiscrimination protections, making it difficult for providers to discern and keep track of which requirements apply to which programs, and to ensure their staff comply with the varied requirements.

113.    The 2021 Grants Rule also will cause confusion about the Runaway and Youth Homelessness Act ("RHYA") program, which funds many youth homelessness services. This program prohibits discrimination on many non-merit factors in its regulations, but not in the authorizing statute. *See* 45 C.F.R. § 1351.22(a) ("No runaway youth or homeless youth shall. . . be excluded from participation in, be denied the benefits of, or be subject to discrimination under, any program or activity funded in whole or in part under the Runaway and Homeless Youth Act" on the basis of "race, ethnicity, nationality, age, religion/spirituality, gender identity/expression, sexual orientation, socioeconomic status, physical or cognitive ability, language, beliefs, values, behavior patterns, or customs[]."). True Colors United anticipates that the 2021 Grants Rule's implication that federal statutes are the sole source of

nondiscrimination protections will cause confusion among service providers as to the ongoing validity of the RHY program's regulatory protections. It will also provide a basis for service providers that are hostile to LGBTQ protections to argue that the RHY regulatory protections no longer apply.

114.    HHS has done nothing to resolve this confusion. Consistent with its regulations, 45 C.F.R. § 1351.23(a), HHS previously required RHY grantees to participate in LGBTQ training and to certify that their programs are non-discriminatory and take LGBTQ needs into account.[49] Since 2017, funding opportunity announcements for RHY grants have not required grant applicants to participate in LGBTQ training or to certify that their programs do not discriminate against LGBTQ youth.[50] HHS also eliminated LGBTQ trainings at the annual conference for RHY program providers in 2019 and 2020. Even if the new administration reverses this trend, the confusion about LGBTQ protections in RHY programs will remain.

115.    As a result, True Colors United anticipates having to devote substantial staff time to responding to inquiries about what legal requirements exist for which programs. These inquiries will likely come from providers with whom True Colors United has previously worked or Continuum of Care organizations. (A Continuum of Care is a regional or local planning body that coordinates housing and services funding for homeless families and individuals.) True

---

[49] *See, e.g.*, Administration on Children, Youth, and Families, 2014 Basic Center Program Funding Opportunity Announcement 5, 20, 56 (May 12, 2014). https://ami.grantsolutions.gov/files/HHS-2014-ACF-ACYF-CY-0792_0.pdf; Administration on Children, Youth, and Families, 2016 Street Outreach Program Funding Opportunity Announcement 6, 7, 22, 59 (July 5, 2016), https://ami.grantsolutions.gov/files/HHS-2016-ACF-ACYF-YO-1124_0.pdf.

[50] *See, e.g.*, Administration on Children, Youth, and Families, 2017 Street Outreach Program Funding Opportunity Announcement (July 11, 2017), https://ami.grantsolutions.gov/files/HHS-2017-ACF-ACYF-YO-1241_0.pdf; Administration on Children, Youth, and Families, 2019 Street Outreach Program Funding Opportunity Announcement (July 1, 2019), https://ami.grantsolutions.gov/files/HHS-2019-ACF-ACYF-YO-1554_0.pdf.

Colors United will also have to engage in proactive outreach reminding service providers about their ongoing nondiscrimination obligations if they receive RHY program funds. True Colors United will not be able to devote this staff time to its other mission critical projects.

116.   Second, the 2021 Grants Rule will also impede True Colors United's mission to convince service providers to make their services safe and affirming for LGBTQ youth and to educate those providers in how to do so. And the 2021 Grants Rule makes it less likely that service providers will seek to contract with True Colors United for education or technical assistance programs.

117.   The removal of the 2016 Grants Rule's uniform requirements eliminates an effective tool upon which True Colors United relied in its outreach to service providers. True Colors United has observed that some service providers are not focused on the needs of LGBTQ youth and that some are actively hostile, but many in both groups are willing to make their services nondiscriminatory when they have an explicit legal obligation to do so. For these types of providers, True Colors United was previously able to rely on the clear and universal protections of the 2016 Grants Rule to convince them to make changes to ensure that their services are safe, affirming, and nondiscriminatory for LGBTQ youth. For example, when conducting trainings at conferences, True Colors United previously presented information on the 2016 Grants Rule's prohibition on discrimination based on sexual orientation and gender identity and engaged in interactive question-and-answer sessions to help providers understand what discrimination looks like in practice, as well as its negative impacts on LGBTQ youth. Without being able to point to universal nondiscrimination protections, True Colors United's efforts to ensure that services are safe and supportive for LGBTQ youth will be less effective.

118.    Further, some service providers that have not traditionally been open to LGBTQ youth have previously sought to engage True Colors United to provide education and technical assistance to make their services nondiscriminatory. True Colors United believes that the 2021 Grants Rule will make service providers less likely to do so, because it removes the legal requirement that was a motivation to change entrenched practices. This will directly impede True Colors United's ability to do its mission critical work of providing education and technical assistance that makes homelessness services safer for LGBTQ youth.

119.    True Colors United anticipates that it will have to rely on other arguments, besides the 2016 Grants Rule's legal requirements, to attempt to convince service providers to make their services accessible to LGBTQ youth. This will be more time consuming for True Colors United's staff who will have to spend time seeking to persuade reluctant or uninterested providers, rather than relying on a legal mandate, and will ultimately be less successful.

120.    Third, the 2021 Grants Rule will impede True Colors United's ability to provide leadership opportunities for LGBTQ young people experiencing homelessness. True Colors United provides various types of these opportunities, but most relevant here is its work on the Youth Action Society, a national association of Youth Action Boards ("YABs"). True Colors United runs the Youth Action Society, committing financial resources and staff time to expanding it and making it succeed.

121.    YABs are typically organized and supported by the local Continuum of Care, but are youth-led, and are made up of youth who have experienced or are experiencing homelessness. True Colors United's technical assistance team members teach Continuum of Care communities how to have successful and empowering YABs. YABs provide an opportunity for youth who have or are experiencing homelessness to engage with other stakeholders in the

process of developing and implementing a plan to end to youth homelessness in the communities where they operate. YABs also provide peer support and an opportunity for their members to develop leadership and other professional skills and to have a constructive outlet on which to focus their experiences of homelessness.

122.     True Colors United's goal for the Youth Action Society is to connect with and support all youth who are members of YABs. Youth become members of YABs on their own initiative or after being identified by a service provider as having leadership potential. It is only realistically possible for a young person to serve on a YAB if they have some level of stability in their lives, both emotionally and as to their access to housing and other services. Such stability is difficult or impossible to maintain when a young person is dependent on services provided by a discriminatory provider. For example, a provider may deny a transgender young person's gender identity or counsel them on the "immorality" of being gay. This discrimination is traumatic, often exacerbates prior trauma, and is likely to result in the young person being unable to focus on or devote emotional energy to membership in a YAB. It may also result in the young person refusing the discriminatory services and exiting the system of service providers that would connect them to a YAB.

123.     LGBTQ youth experiencing homelessness may interact with many different HHS-funded programs. For some of the providers with whom youth interact—*e.g.*, Social Security Act Title IV-E-funded child welfare agencies—discrimination based on LGBTQ identity will not be prohibited by federal statute or regulation under the 2021 Grants Rule. Others, such as RHY-funded providers, may be confused about their obligations or may argue that the 2021 Grants Rule frees them of those regulatory obligations. In True Colors United's assessment, then, the 2021 Grants Rule is likely to result in more LGBTQ youth experiencing homelessness having

discriminatory encounters with service providers, compared to under the 2016 Grants Rule. This increase in discrimination will result in fewer youth participating in YABs, either because they are too traumatized to do so or they have exited the system of services that could connect them to this opportunity. As a result, True Colors United will be frustrated in its ability to provide these young people with opportunities for leadership and professional development and supportive peer connections via the Youth Action Society. True Colors United has a limited period of time during which it may reach these vulnerable young people, and the failure to do so is irreparable.

124.    Fourth, the 2021 Grants Rule will force True Colors United to continue to divert its limited staff time and resources to obtaining state-level protections to replace the defunct federal standards. As a direct response to HHS's 2019 announcement that it would not enforce the 2016 Grants Rule[51], True Colors United began these efforts in New Mexico, Maryland, and two other states, requiring True Colors United's Public Policy and External Affairs Director to review those states' current regulations and programs, craft recommended policies, engage with the relevant state agencies, and travel to further meet with those agencies in person. True Colors United will be forced to continue this time-consuming work should the 2021 Grants Rule go into effect.

125.    Because a limited percent of states have protections in place for LGBTQ youth experiencing homelessness, True Colors United expects to continue this work to improve protections in as many states as possible. For each state, this will require True Colors United to conduct research on the unique issues facing LGBTQ youth experiencing homelessness in that state, craft state-specific recommendations, engage with state agencies and stakeholders, and—to

---

[51] Notice of Nonenforcement of Health and Human Services Grants Regulation, 84 Fed. Reg. 63,809-01 (Nov. 19, 2019).

the extent new protections are adopted by state regulations—participate in the regulatory process by submitting public comments on proposed rulemakings.

126.    In order to combat the harm caused by HHS's actions with these responsive efforts, True Colors United has already expended valuable staff time and resources. As noted above, in response to the 2019 Notice of Nonenforcement, True Colors United's staff have already spent numerous hours on state-level work and its education and outreach campaign. Going forward, True Colors United expects to continue to divert a significant amount of its staff time and resources to both efforts.

127.    All of the efforts described above require that True Colors United's limited resources be diverted from its other work. Prior to the HHS's 2019 Notice of Nonenforcement and the 2021 Grants Rule, TCU's Public Policy and External Affairs team had planned on a radically different "capacity-building" agenda, which would have included conducting regional summits to facilitate resource and information sharing between communities facing similar challenges and to empower and train local youth, providers, and advocates to organize their own grassroots campaigns, as well as a youth legislature project for transgender youth to receive hands-on training in state legislative advocacy. True Colors United's Public Policy team no longer plans to pursue budgetary resources for those regional conferences because the team will not have enough time to plan or facilitate them. As a result, the youth legislative project was postponed until 2021, and is now further postponed until 2022. But for the Notice of Nonenforcement and 2021 Grants Rule, True Colors United would not have had to divert resources away from that work.

d. <u>SAGE</u>

128.    Finally, the 2021 Grants Rule also conflicts with, impairs, and frustrates SAGE's mission and activities by impeding its ability to ensure that LGBTQ older people are able to age with dignity; in so doing, it causes irreparable injury.

129.    The 2021 Grants Rule will frustrate SAGE's work in its New York City SAGE Centers. In these Centers, SAGE provides holistic coordinated care to LGBTQ older people and the people who support them. These services include information and referrals, case management, benefits and entitlement assistance, help with caregiving issues, services focused on LGBTQ veterans and for people living with HIV, and various support groups. Through its Centers, SAGE also provides housing services, for which the need is especially acute.

130.    New York City's metro area is home to the largest LGBTQ population in the United States and is the historic epicenter of the nation's LGBTQ rights movement. As a recent City survey found, however, "the stark reality is that LGBTQ people in New York … continue to face discrimination, harassment, and violence as a result of their sexual orientation or gender identity."[52]

131.    The 2021 Grants Rule will compromise the SAGE Centers' ability to make successful referrals of their clients to service providers. For many of the people SAGE serves, the combination of past trauma resulting from discrimination and fear of future discrimination is an insurmountable barrier to seeking services from providers known as being discriminatory or associated with a discriminatory ideology. SAGE has observed that this problem is especially

---

[52] *Results of a Survey of LGBTQ New Yorkers*, New York City Comptroller (June 20, 2017), https://comptroller.nyc.gov/reports/results-of-a-survey-of-lgbtq-new-yorkers/.

acute for transgender people who are afraid of being "outed" by a faith-based housing services provider.

132.    For example, one nation-wide faith-based organization, which receives federal funds for various social service programs, including from a wide variety of HHS funding streams, has a large presence in New York City, providing anti-hunger and housing services, among others. SAGE's clients are aware that this provider has a history of LGBTQ discrimination. SAGE Centers will sometimes make referrals to this provider as a last resort when it is the only realistic option available for a particular client. These referrals are often rejected when offered because of this provider's history.

133.    SAGE expects that if it could assure its clients that federal nondiscrimination protections apply to this provider, and others like it, some would be more willing to accept these referrals and obtain the services they need. While there are some state and local LGBTQ nondiscrimination protections in New York City, a lack of federal protections (such as that resulting from the 2021 Grants Rule) creates confusion amongst SAGE's clients as to what their rights are, which makes them reluctant to accept referrals to providers they suspect of discrimination.

134.    SAGE anticipates that the 2021 Grants Rule will require its SAGE Centers to spend additional staff time providing case management support for clients who need HHS-funded services and support for those who are rejected from services where they have faced discrimination. Without universal nondiscrimination protections in place, SAGE staff will have to spend more time encouraging their clients to take advantage of available services and supporting them in ensuring that their experiences with the service providers are safe and affirming.

135.    SAGE Centers endeavor to serve all clients as completely and quickly as possible but face the reality of limited staff capacity. Any increase in staff time needed to serve a particular client will impede SAGE's ability to serve other clients. Further, given the increased need for social services resulting from the pandemic, SAGE Centers staff are already stretched very thin, and have little ability to absorb the increased demand on staff time SAGE anticipates will result from the 2021 Grants Rule.

136.    The 2021 Grants Rule also impedes SAGE's work to ensure LGBTQ older people are treated with respect and dignity nationwide. SAGE previously relied on the 2016 Grants Rule to set a baseline of protections. The removal of its protections requires SAGE to divert significant resources. Following HHS's Notice of Nonenforcement, SAGE's work to obtain state-level support for LGBTQ older people accelerated. State policy can help to fill the gap left by the nonenforcement of the protections in the 2016 Grants Rule. This work will continue for SAGE and become even more essential because the 2021 Grants Rule goes further and permanently eliminates the federal protections against LGBTQ discrimination.

137.    Specifically, SAGE has been working to obtain designations of LGBTQ people as a population of "greatest social need" for the purposes of Older Americans Act services, a designation which requires particular focus on the aging needs of populations so-identified. Per guidance from HHS's Administration for Community Living ("ACL"), states have the discretion to designate certain populations, including LGBTQ older people, as greatest social needs populations. SAGE succeeded in obtaining this designation in Washington, DC in 2020, which required dozens of hours of staff time, and is continuing this work in several states. In the absence of the 2016 Grants Rule, this work will be more pressing—while a greatest social need designation does not make up for the lost baseline requirement of nondiscrimination from the

2016 Grants Rule, it does provide an official acknowledgement of and focus on the unique needs of LGBTQ older people.

138.    SAGE's work obtaining greatest social needs designations will also be more difficult and time consuming as a result of the 2021 Grants Rule. Previously, when explaining that LGBTQ older people have greater needs, SAGE could assert that the potential for discrimination based on LGBTQ identity in aging services is recognized federally. Without the 2016 Grants Rule, SAGE will no longer be able to rely on that straightforward argument, and will need to devote additional time and effort to convince state policy makers of the importance of recognizing the unique needs of LGBTQ older people.

## CLAIM FOR RELIEF

### Agency Action That Is Arbitrary and Capricious, An Abuse of Discretion, or Otherwise Not in Accordance with Law in Violation of 5 U.S.C. § 706(2)(A)

139.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

140.    Under 5 U.S.C. § 706(2), courts shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; or without observance of procedure required by law.

141.    The 2021 Grants Rule is arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things: Defendants failed to provide a reasoned explanation for changing policy from the 2016 Grants Rule and for eliminating nondiscrimination protections; the proffered justifications for the Rule are unsupported, legally incorrect, and unreasoned; the 2021 Grants Rule is unsupported by the record; and Defendants

failed to consider the costs and benefits of their decision and the Revised Grants Rule's impact on reliance interests.

## **Prayer for Relief**

WHEREFORE, Plaintiffs pray that this Court:

1.      issue immediate relief in the form of an order staying the effective date of the 2021 Grants Rule pending judicial review, pursuant to 5 U.S.C. § 705, or an order preliminary enjoining Defendants from implementing, applying, enforcing, or issuing any guidance relating to the 2021 Grants Rule as it relates to 45 C.F.R. §§ 75.300(c) and (d) during the pendency of this action until further order of the Court;

2.      declare that the 2021 Grants Rule violates the APA;

3.      set aside and vacate the revision to 45 C.F.R. § 75.300(c) and (d), and related provisions at 45 C.F.R. § 75.101;

4.      award Plaintiffs costs, attorneys' fees, and other disbursements for this action; and

5.      grant any other relief this Court deems appropriate.

DATED: February 2, 2021

Respectfully submitted,

   */s/Robin Thurston*_____

Robin Thurston (D.C. Bar No. 1531399)
Kristen Miller (D.C. Bar No. 229627)
Sean Lev (D.C. Bar No. 449936)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 701-1782
rthurston@democracyforward.org
kmiller@democracyforward.org
slev@democracyforward.org

M. Currey Cook (NY Bar No. 4612834)*
Lambda Legal Defense and Education Fund
120 Wall St., 19th Fl.
New York, New York 10005
(212) 809-8585
ccook@lambdalegal.org

Sasha Buchert (OR Bar No. 070686)*
Lambda Legal Defense and Education Fund
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
sbuchert@lambdalegal.org
(202) 804-6245

Peter T. Barbur (NY Bar No. 2260545)*
Katherine D. Janson (NY Bar No. 4404612)*
Rebecca J. Schindel (NY Bar No. 5528500)*
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
pbarbur@cravath.com
kjanson@cravath.com
rschindel@cravath.com

*Counsel for Plaintiffs*

\* *Pro hac vice* application forthcoming